In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1215

United States of America,

Plaintiff-Appellee,

v.

Daniel A. Kosth,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. 98-40028-001--Michael M. Mihm, Judge.

Argued November 13, 2000--Decided July 18, 2001


   Before Harlington Wood, Jr., Kanne, and
Diane P. Wood, Circuit Judges.

   Diane P. Wood, Circuit Judge.  Daniel
Kosth was convicted on four counts of
making false statements in violation of
18 U.S.C. sec. 1001 in connection with
loans from the Small Business
Administration (SBA). His appeal rests
principally on a claim that the evidence
was insufficient to support those
convictions, although he also raises a
few other arguments and he claims error
in the trial court's application of the
Sentencing Guidelines. We find that the
evidence was adequate to support the
jury's conclusions and that no other
reversible error occurred, and we
therefore affirm the convictions.

I

   The genesis of this case can be found in
Kosth's plans to convert an abandoned 40-
acre golf course and recreation area in
Orion, Illinois, into the Hillcrest
Resort. In the summer of 1992, he
approached Charles Azzaline and Peter
Gray about purchasing the land and
becoming partners in Hillcrest Resort,
Inc. He described his idea for the
resort, but he did not tell Azzaline and
Gray about his own dubious background.
Kosth had recently been released from
federal prison after serving time on a

financial fraud conviction. One of the conditions of his supervised release was that he notify any financial institution with which he did business of his previous offense, his conviction, and his supervised release status. Kosth, aware that his new venture was not likely to succeed if he complied with the terms of his supervised release, hatched a plan. Part one of the plan called for him to avoid disclosing his past to his partners and any financial institutions that he dealt with by concealing his ownership interest in Hillcrest. Part two, which he also implemented, required him to place his one-third stock interest in the Hillcrest Resort, Inc. in his wife name, alleging that he was doing so for tax purposes.

These arrangements did not change the fact that Kosth enjoyed all the rights and benefits that come with having a substantial ownership interest in a closely held corporation. His wife, Terri Kosth, had none of them. Terri Kosth's Hillcrest stock was acquired almost exclusively with in-kind contributions of building supplies; supplies which a reasonable jury could have concluded came from Daniel Kosth's construction business. It was Kosth who incorporated Hillcrest. He co-signed the deed to purchase the Hillcrest property with Azzaline and Gray. He was named vice president and was empowered to write checks and enter into contracts on Hillcrest's behalf. He ran Hilcrest monthly board meetings and he regularly voted Terri's ownership interest. Hillcrest implemented a stock reversion agreement under which, upon the death of any stockholder, the stock would revert to the corporation rather than to the stockholder's heir. But the agreement included a special provision for the stock held by Terri; her stock was to revert to the corporation upon Daniel Kosth's death. Finally, when itsuited his purposes, Kosth publicly held himself out to be a one-third owner of Hillcrest.

In 1992, Hillcrest Resort Inc. purchased the golf course and recreation area property for $170,000. Kosth negotiated this transaction and subsequently negotiated additional financing for the renovation of the property with Orion Bank. In keeping with his plan, Kosth relied on his nominal non-ownership of

Hillcrest to avoid his obligation to disclose his criminal past to Orion Bank. During 1992 and 1993, Orion loaned Hillcrest $70,000 and took a security interest in private property owned by Azzaline, Gray, and Terri Kosth. For Terri, this included a real estate business that she owned, named Quad Cities Property Management, as well as several pieces of real property. Using the proceeds of this initial loan, Hillcrest hired Bi-State Construction to begin the renovation of the golf course. Daniel Kosth was the sole owner and President of Bi-State.

Unfortunately, in the summer of 1993 severe rains caused significant damage to the Hillcrest property. Kosth initially requested an additional $400,000 loan from Orion on behalf of Hillcrest. Orion denied his request. It agreed instead that it would loan Hillcrest the money to pay off the $130,000 still owed on the original contract for the property andextend an additional $70,000 in credit, provided that Hillcrest paid off its outstanding debt on the original $70,000 loan. This offer appealed to Kosth, but he needed to find someone to loan him the money to pay off the outstanding debt to Orion. His eye fell on the SBA, which, because of the heavy rains in the area including Hillcrest, had decided thatresidents there were eligible for its low interest disaster assistance loans.

Kosth completed preliminary paperwork for the Federal Emergency Management Agency, met with the local SBA representative, and then filled out the SBA disaster loan application. That application required Kosth to identify all the managers of Hillcrest Resort, Inc., and defined a manager as anyone with an ownership interest in the company of greater than 20%. Kosth put down Azzaline, Gray, and Terri Kosth. The application then required Kosth to disclose whether any of the managers had ever been convicted of a crime. None of the managers he had listed ever had, so he put "no."

Shortly after he submitted the application, an SBA loss verifier visited the Hillcrest property. Following an inspection of the damage, the loss verifier prepared an estimate for the

repairs of $151,000. This estimate had as a built-in component a standard 15% profit margin. The catch was that under the terms of the SBA's loan agreement with Hillcrest, this profit could not be enjoyed by companies affiliated with Hillcrest (without prior permission of the SBA) or by the immediate family members of Hillcrest's principals. The language of the agreement to this effect was clear:

Borrower will not use any proceeds of this Loan to pay wages or any other compensation for repair work performed by Borrower or members of Borrower's immediate family.

The loan agreement also specified that loan proceeds could be used only to pay for disaster repairs and that any money not needed to complete the repairs had to be returned.

Despite this language, Kosth thought he saw a way around it. He submitted a financing proposal to Orion Bank in which he declared that, using his company Bi-State, he could complete all the repairs at Hillcrest and retain a $70,000 profit. He would then take this profit and give it to his wife. She in turn would loan it to Hillcrest, as an officer loan, and Hillcrest would use the loan to pay off its outstanding obligation to Orion. Once this was done, Orion would pay off the $130,000 mortgage on the Hillcrest property and extend a new $70,000 loan to Hillcrest.

Recognizing the potential problem created by the terms of the SBA loan agreement, Orion approved the financing proposal contingent upon receipt of a letter from the SBA "evidenc[ing] their full knowledge and approval of the method you plan to use to make the necessary repairs to the resort and retire Hillcrest's existing indebtedness to the bank." Kosth consulted an attorney to determine what kind of disclosure would satisfy the terms of the loan agreement. Although Kosth gave the attorney all of the relevant documents, he somehow neglected to inform him that he (Kosth) intended to take $70,000 of the $151,000 loan as profit and not to return it to the SBA. Based on the information he had, Kosth's attorney advised Kosth that everything should be fine if Hillcrest

disclosed that one of its partners was married to the owner of Bi-State. Azzaline and Gray--also unaware of Kosth's plan to take $70,000 profit from the loan--were satisfied with this advice.

Kosth then carried out the master plan. Acting on behalf of Hillcrest, he sent a letter stating Hillcrest's desire to "continue its business relationship" with Bi-State and disclosing that Terri Kosth was married to Bi-State's owner. With the letter, Kosth enclosed Bi-State's "Construction Agrement [sic]" with Hillcrest, which included its "bid, work schedule agrement [sic] with payment requirements." This document itemized the proposed repairs and, without indicating any profit line item, projected a total project cost of $151,000. The SBA received the letter and began making disbursements payable to Hillcrest and Bi-State in March of 1994.

Between April and November 1994, the SBA approved $190,000 in disaster loan funds for Hillcrest and actually disbursed $176,000 of that total. The increase over the original $151,000 came as a result of several "urgent" requests from Kosth claiming that he needed additional funding to complete the Hillcrest repairs. The SBA also gave Kosth a $15,900 loan for a separate economic injury.

The first two SBA disbursement checks, totaling $130,000, were deposited into Bi-State's account in April and May of 1994. Using this money, Kosth wrote checks totaling $118,800 to Quad Cities Property Management. Terri Kosth then transferred $70,000 of this money to Orion Bank to pay off Hillcrest's outstanding debt. Orion in turn loaned Hillcrest the $200,000 as promised and released its security interest in the Hillcrest partners' private property. Terri Kosth then wrote two checks for $45,000 from her Quad Cities account to Hillcrest. Through this money-shuffling, the Kosths managed to use the SBA loan proceeds to put Hillcrest in debt to Terri Kosth and Quad Cities to the tune of $115,000. Shortly after the third loan disbursement check for $21,000 was deposited in Bi-State's account, Kosth made out several checks for cash. He also paid off over $5,000 in gambling and

credit card debts with checks drawn on Bi-State's account.

Things began unraveling in late 1994, when the U.S. Attorney's office sent a letter to the SBA expressing concern about Kosth's receipt of SBA funds. That letter prompted the SBA to send an inspector, Karl Dietz, to Hillcrest on November 16, 1994. In preparation for Dietz's visit, Kosth prepared an accounting of Bi-State's use of SBA funds. This accounting contained a line item indicating that Bi-State had made $13,275 in profit and incurred $5000 in administrative costs to date. Dietz, seeing the line items, crossed them out and wrote "not eligible."

As a result of the information Dietz gathered, the SBA halted any further disbursements of funds to Hillcrest. On June 18, 1998, the grand jury returned a four count indictment against Kosth alleging that he had made numerous false statements to the SBA, all in violation of 18 U.S.C. sec.1001. As we have already noted, a jury convicted Kosth on all four counts. Following his conviction, Kosth moved for a judgment of acquittal and for a new trial, under Fed. R. Crim. P. 29(c) and 33 respectively. The district court denied both motions. On January 13, 2000, Kosth was sentenced to 46 months' imprisonment and required to pay $128,593 in restitution. Kosth appeals both his conviction and his sentence.

II

A. Evidentiary Challenges

Kosth raises a number of challenges to his conviction. We can dispose quickly of his evidentiary claims, which challenge the district court's decision to admit evidence of his prior conviction, the terms of his supervised release, and his gambling. These kinds of decisions are reviewed for abuse of discretion. United States v. Van Dreel, 155 F.3d 902, 905 (7th Cir. 1998). In this case, there was none. The government wanted to use, as part of its proof on Count I of the indictment, the fact of Kosth's prior conviction to show that Kosth lied when he stated on the SBA loan application that none of Hillcrest's managers had criminal records. It sought to introduce the terms of his supervised release to

establish Kosth's motive for originally establishing the sham ownership arrangement with his wife. Both of these are proper bases for admitting what would otherwise arguably fall within the scope of Fed. R. Evid. 404(b)'s prohibition against the use of other wrongful acts evidence. The court also issued appropriate cautionary instructions that prohibited the government from telling the jury the nature of the previous conviction and clearly delimited the purposes for which the evidence could be considered. The government's evidence that Kosth spent part of the SBA loan money on gambling was also properly admitted as direct evidence relating to the charges in Count III, which asserted that Kosth falsely represented to the SBA that he would use the SBA loan money only for repairs of the Hillcrest property.

B.  Jury Instructions

Kosth next argues that the district court's instruction to the jury regarding the government's "sham ownership" theory was erroneous. We review the district court's decisions regarding jury instructions for abuse of discretion. United States v. Neville, 82 F.3d 750, 759 (7th Cir. 1996). If jury instructions fairly and accurately summarize the law and have support in the record they will not be disturbed on appeal. United States v. Wimberly, 79 F.3d 673, 676 (7th Cir. 1996).

The instruction at issue was worded as follows:

Also as to Count I, if the defendant made or used, or caused to be made or used a document containing a statement and that statement represented as true a false front or sham ownership arrangement in an effort to qualify to receive a government loan, such conduct would be unlawful provided the government proves, in connection with that statement, each of the five [elements of a false statement offense]. It is for you to determine whether the ownership arrangements regarding Hillcrest Resorts, Inc. constituted a false front or sham.

Kosth contends that this instruction was erroneous because it failed to specify the "elements" of a sham ownership

arrangement. In support of this argument, he cites a number of tax liability cases involving sham ownership allegations. See, e.g., Sacks v. Commissioner, 69 F.3d 982, 986 (9th Cir. 1995). The doctrine of sham ownership in the context of tax liability determinations, however, is at most a useful indicator that judges and juries may look beyond formalities to determine questions of income and, in this case, ownership. See, e.g., Buelow v. Commissioner, 970 F.2d 412 (7th Cir. 1992) (noting tax court's decision that property assigned by defendant to sham trust remained his property for tax purposes). The specific elements of this tax liability doctrine are not applicable here.

The government's theory in this case was straightforward: Kosth was the true owner of the shares in Hillcrest but he used his wife Terri as the paper owner in order to gain access to and control over government benefits to which he otherwise would not have been entitled. The impropriety of this kind of evasion has long been well established in the case law. United States v. Kingston, 971 F.2d 481 (10th Cir. 1992) (defendant who paid sham-buyers to be title-holders in order to get access to HUD and VA loans induced false statements in violation of sec. 1001); Harrison v. United States, 279 F.2d 19 (5th Cir. 1960) (entries in bank's books indicating loan to city were false statements where mayor was true beneficiary of the loans); United States v. Swaim, 757 F.2d 1530 (5th Cir. 1985) (affirming conviction for scheme to conceal purchase price of building in order to acquire federal loan); Ehrlich v. United States, 238 F.2d 481 (5th Cir. 1956) (scheme to use veterans' names to obtain subsidized price for properties supported conviction under sec. 1001). Even if the instruction could have been more detailed with respect to the relevant indicia of ownership (an issue Kosth has not raised and thus has waived), the concepts of "sham" and "false front" did not require any further specification to state the law adequately for the jury's purposes. This instruction, in short, did not give rise to reversible error.

C. Sufficiency of the Evidence

We come, then, to Kosth's principal argument, which attacks the sufficiency of the evidence on all four counts. Although Kosth properly preserved both his argument for acquittal as a matter of law and for a new trial in the procedural sense, see United States v. Griffin, 194 F.3d 808, 816-18 (7th Cir. 1999), from a substantive standpoint it is exceedingly difficult to succeed on either ground. On this type of review, the appellate court must consider the evidence in the light most favorable to the verdict. Only if, from this vantage point, the record contains no evidence from which the jury could have found guilt beyond a reasonable doubt, is reversal appropriate. E.g., United States v. Hickok, 77 F.3d 992, 1002 (7th Cir. 1996). Our review of the district court's denial of the Rule 33 new trial motion is also deferential; as the late Professor Charles Alan Wright's respected treatise puts it, "[t]he appellate court properly defers to the view of the trial court [on the denial of a Rule 33 motion], and will affirm unless there has been error as a matter of law or a clear and manifest abuse of judicial discretion." 3 Charles Alan Wright, Federal Practice and Procedure: Criminal (2d), sec. 559 at 368 (1982).

## 1. Count I

Count I of the indictment charged Kosth with making a false statement on the SBA disaster loan application in violation of 18 U.S.C. sec. 1001. To convict under this statute the government must prove beyond a reasonable doubt that (1) the defendant made a statement, (2) the statement was false, (3) the statement was material, (4) the statement was made knowingly and willfully, and (5) the statement concerned a matter within the jurisdiction of a federal department or agency. United States v. Ross, 77 F.3d 1525, 1543-44 (7th Cir. 1996).

The government alleged that Kosth knowingly made a material false statement when he indicated on the disaster relief application that Terri was a manager of Hillcrest and that no Hillcrest manager had a criminal record. According to Kosth, the government's case founders on the second and third of the sec.1001 requirements--falsehood and materiality. He claims that he was not required to

identify himself as one of Hillcrest's managers or to disclose his criminal history on the SBA disaster relief application because the SBA application defined "manager" as any person owning at least 20% of the company's stock, and it was Terri who owned 30% of the shares in Hillcrest Resort, Inc.

This position implies that the jury was required to accept the superficial arrangements Kosth had made as reality. The government, however, presented evidence intended to convince the jury that Terri Kosth was merely a sham or straw owner of Hillcrest. Although Kosth attacks the sufficiency of the evidence of sham ownership, we are satisfied that there was enough evidence in the record to support the jury's decision to accept the government's version of events. There was ample evidence to support findings that Hillcrest Resorts, Inc., was Kosth's idea; that because of the terms of his probation, he needed a way to conceal his ownership interest in Hillcrest when dealing with financial institutions and the SBA; and that he used his wife for this purpose. Among the most compelling evidence that he was the true owner of the stock was the stock reversion agreement that provided that Terri Kosth's stock would revert to the corporation in the event of Daniel Kosth's death. It was also telling that Daniel Kosth regularly voted his wife's shares, that Terri played no role in the management of the business, and that she acquired 90% of "her" stock interest through in-kind contributions of building materials, goods which Daniel Kosth, as owner of a construction company, was well positioned to supply. This evidence, when considered in conjunction with the extensive evidence of Kosth's control over the day-to-day operations of Hillcrest, supports the jury's conclusion that Kosth was the true part-owner and manager of Hillcrest, that he knew this to be the case when he filled out the SBA loan application, and that he made the false statement with the intention of obtaining an SBA loan which he realized he was otherwise unlikely to get. Cf. Ehrlich, 238 F.2d at 483-84 (whether veterans' statements were true depended on jury's determination of the nature of the defendant's scheme).

Perhaps recognizing the problem the

evidence presented at trial created for his claim of innocence, Kosth tried tointroduce two affidavits with his Rule 29 and 33 motions whose purpose was to buttress the bona fides of Terri's separate ownership. He has continued to rely heavily on these affidavits in his arguments on appeal. But the district court, while allowing the affidavits to be filed, made clear that they would be considered only for the limited purpose of one of the specific claims of error in Kosth's motion for a new trial. Kosth did not argue that they were pertinent to the government's sham ownership claim in that motion, nor were they admitted for that purpose. We therefore do not consider them to be part of the record and decline Kosth's invitation to treat them as if they were evidence before the jury. We note in addition that they would not have anything like the dispositive effect Kosth attributes to them, even if they were properly here.

   Kosth stresses, and we agree, that he cannot be convicted under sec.1001 for statements that are literally true, see United States v. Lozano, 511 F.2d 1 (7th Cir. 1975), and that there is no "sham" if the owner of property transfers his entire interest in the property to a third party and then denies ownership of that property. See United States v. Gahagan, 881 F.2d 1380 (6th Cir. 1989). We note at the outset that Kosth did not request a "literal truth" instruction or otherwise assert this defense at trial. Even if it was not waived, a full review of the record shows that the jury did not convict Kosth for literally true statements. The whole point of the government's evidence was that, unlike the defendant in Gahagan, Kosth had not relinquished the benefits of owning the property at the time he completed the SBA application. To the contrary, he enjoyed all the real indicia of share ownership and he was actively managing both the board and the operations of the company. If, as we conclude it reasonably could have done based on the evidence before it, the jury determined that Terri Kosth's nominal stock ownership was simply part of Daniel Kosth's scheme to conceal the fact that he was the part-owner of Hillcrest Resort, Inc., then neither his claim that Terri Kosth was the owner of 30% of the Hillcrest stock, nor his claim that no Hillcrest manager

had a criminal record was literally true.

2. Count II

Count II charged Kosth with submitting a construction agreement to the SBA that indicated that Bi-State developers (his company) would generate no profit from the proceeds of the SBA loan, even though he knew that Bi-State would reap approximately $70,000 from the Hillcrest loan. Once again, this was alleged to violate the false statement statute, 18 U.S.C. sec. 1001. Kosth submitted the construction agreement at issue together with his letter seeking permission to have loan proceeds go to Bi-State. Kosth argues that nothing he said in the contract made any promises about profits, because the contract simply indicated the total amount that would be necessary for the repairs--$151,000 initially--and that all such estimates include some percentage mark-up for profit. He reasons that the SBA must have known that some part of that $151,000 represented profit, and supports his argument with testimony from SBA estimators who confirmed that it is standard practice to build a profit figure into the projected cost for each item of repair in the estimate. The contract Kosth submitted reproduced the SBA estimator's figures and made no mention of Bi- State's expected profits.

The government's case, however, rested on the fact that Kosth was not just an ordinary borrower. Kosth submitted his estimate as part of a request to be exempted from the express terms of the SBA loan agreement. That agreement specifically prohibited use of loan funds to pay the borrower or members of the borrower's family and it required the loan recipient to retain only those funds needed to make the necessary repairs. The jury heard considerable evidence that, given these terms, Kosth was required not only to get permission from the SBA to have loan proceeds go to Bi-State, but also to have Bi-State take a profit. Moreover, there was evidence that Kosth was well aware that the SBA loan agreement created such a requirement. After evaluating the loan agreement, Orion Bank informed Kosth that he needed to disclose both Bi-State's relationship to Hillcrest and that he intended to use $70,00 of the loan proceeds to pay off

his existing debt to Orion. The fact that Kosth intentionally withheld from his attorney and his partners the fact that he intended to take a profit on the loan, and the fact that he prepared one estimate for Orion with a profit line, and a "carbon copy" for the SBA without one, was also evidence that he understood the SBA's expectations under the terms of the loan agreement. Instead of requesting permission to retain a portion of the loan proceeds as profit, however, Kosth's letter to the SBA seeking an exemption only disclosed that Bi-State would be receiving the proceeds of the loan.

Absent a disclosure of Kosth's intent to take a profit, the SBA assumed that Kosth would only request the amount Bi-State actually needed to complete the repairs, and a reasonable jury could conclude that Kosth knew it. Thus, when he submitted to the SBA an estimate for $151,000 without an indication that he would be taking a profit, knowing that in fact this was $70,000 more than what he would need and would be entitled to under the terms of the loan agreement, Kosth made a false statement to the SBA.

In sum, while we consider this to be a close call, we believe the jury could reasonably have concluded that, in the context of Kosth's negotiations with the SBA to escape the prohibitions in the SBA loan agreement, he knew the estimate that he submitted would be assumed by the SBA not to contain a profit and that this was clearly false. Kosth attempts to portray the government's theory as absurd, suggesting that the government thinks the SBA assumed he would do the work for "free." What the SBA assumed, absent any contrary indication from Kosth, was that Kosth would comply with the terms of the loan agreement and do the work without any additional profit but with all costs covered.

3.  Count III

This count charged that Kosth made false statements in violation of sec.1001 when he signed the SBA loan agreement and thereby represented that "the proceeds of the loan would be used solely to rehabilitate and replace Hillcrest property damaged and destroyed by disaster flooding," when he knew that "a

purpose of the application for an SBA disaster loan was to generate financial profit for Bi-State Developers . . . so that the profit could be used to pay off preexisting debt of Hillcrest." Once again, from the perspective we are required to use in evaluating a jury's verdict and a district court's denial of a motion for new trial, we see nothing that requires reversal.

According to Kosth, it was just the government's misfortune that the loan money it gave Bi-State to perform the re pairs was substantially in excess of the amount actually required to do the work. His ability to complete the job while retaining a profit of $70,000 entitled him to a windfall that he could use to retire Hillcrest's $70,000 debt. Even if we indulge in the economically reasonable assumption that part of the cost of performing work is a profit to the contractor, however, that does not answer the question whether Kosth was entitled to tell the SBA that he needed $151,000 to do the work when he knew all along that he needed only $81,000. As the government argued and the evidence showed, he took the extra money knowing that he (through Bi-State) would spend the excess proceeds to benefit Hillcrest in a manner not permitted by the terms of the loan agreement. Furthermore, the loan agreement itself required him to return any funds that were not required for doing the repair work. The evidence is crystal clear that Kosth planned from the start to use almost half of the loan to pay the Hillcrest debt; his correspondence with Orion leaves no doubt on the point. And this was indeed what he did, along with using other parts of the money for a variety of personal expenditures. It is difficult to see how the jury could have come to any other conclusion on this part of the case.

4.  Count IV

Last, Count IV charged Kosth with making a materially false statement in violation of sec. 1001 when he submitted a report to the SBA indicating that Bi-State had generated $13,275 in profit from the repair work supported by the loan, when he "well knew, Bi-State Developers already had generated a profit of approximately $70,000" from the loan. The

jury had ample evidence before it to support the conviction on this count, for both Rule 29 and Rule 33 purposes.

When Kosth was preparing for SBA Inspector Dietz's visit on November 16, 1994, he prepared an accounting of his use of the SBA funds that included a line item indicating that Bi-State had earned just over $13,275 in profit. He did so at a time after he had already taken $70,000 of the SBA loan proceeds and deposited them in Terri's account to use for the repayment of the debt Hillcrest owed to Orion Bank. Dietz, seeing the $13,275 line item, crossed it off and wrote "not eligible."

The jury saw this as a false statement, and Kosth is hard pressed to challenge that characterization. He does, however, urge that it was not "material" for purposes of sec. 1001, citing United States v. Gaudin, 515 U.S. 506 (1995). His misstatement, he claims, had no "natural tendency to influence" the SBA's decision, nor was it capable of influencing the agency's decision. Any profit at all was impermissible under the government's theory, so why should $13,275 be any different from $70,000?

We see no merit to this line of argument. Although the government was alleging that Kosth was not entitled to any profit, it was also asserting that he was using the proceeds of the loan for impermissible purposes. A claim that he was earning approximately 8.8% profit on the work would have made his story of the inclusion of an ordinary profit in the line items far more plausible than a claim that he was earning more than 46% profit on the same work. Moreover, Dietz was there to find out how the money was being used, period: telling him that only $13,275 was profit when the real number was $70,000 changed the entire picture. The district court committed no error when it rejected Kosth's challenges to his conviction on Count IV.

III

Kosth has also raised several challenges to his sentence. The district court gave him a two-level enhancement for more than minimal planning, under U.S.S.G. sec. 2F1.1(b) and sec. 1B1.1; it found that he was a leader or organizer under sec.

3B1.1(c); it enhanced his sentence based on the amount of the fraud eight levels under sec. 2F1.1 (finding that $200,000 was involved); and it required him to pay restitution in the amount of $128,593 to the SBA. We find no reversible error in any of the district court's actions. The district court's findings about the amount of planning and Kosth's leadership role were not clearly erroneous. It explained the $200,000 figure by noting that Kosth received or had commitments to receive $205,000 from the SBA when all was said and done. Relying on note 8(d) to sec. 2F1.1, the court found that Kosth diverted the full $205,000 from the intended recipients of SBA loans, even though the agency had not gotten around to disbursing everything by the time the scheme unraveled. We agree that this is the proper way to interpret that guideline. And there is no merit at all to his challenge to the restitution amount, which could have been even higher than the level the court imposed.

As for the remaining issues Kosth has raised, suffice it to say that we find nothing that requires reversal, or that merits discussion here. The judgment of the district court is Affirmed.