In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-1381

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER A. BEAVER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 06 CR 61—**Larry J. McKinney**, *Judge.*

ARGUED OCTOBER 22, 2007—DECIDED FEBRUARY 4, 2008

Before KANNE, EVANS, and WILLIAMS, *Circuit Judges.*

KANNE, *Circuit Judge.* A federal jury found Christopher Beaver guilty of participating in a price-fixing conspiracy, 15 U.S.C. § 1, and making false statements to a federal law enforcement agent who was investigating that conspiracy, 18 U.S.C. § 1001(a)(1). Beaver challenges his convictions on appeal, arguing that the government failed to prove at trial that a price-fixing conspiracy existed, that he joined the conspiracy, or that he made false statements. We affirm.

## I. HISTORY

In October 2003, Gary Matney, a manager at the Indianapolis office of Prairie Material Ready-Mix Concrete, approached the Federal Bureau of Investigation to report the existence of a price-fixing conspiracy involving several of Prairie Material's competitors. According to Matney, Prairie Material was being pressured to join the conspiracy, a claim that led the FBI to investigate the pricing activities of five ready-made concrete producers in the Indianapolis metropolitan area: (1) Shelby Materials, Inc.; (2) Builder's Concrete & Supply Co., Inc.; (3) Irving Materials, Inc.; (4) Hughey, Inc.; and (5) Ma-Ri-Al, which does business as Beaver Materials Corp. The investigation reached a turning point on May 25, 2004, when FBI agents executed search warrants on the five companies, and interviewed the companies' corporate officers and employees regarding the existence of the conspiracy. Information recovered at that time substantiated many of Matney's claims, and set into motion a chain of events that would mark the demise of the price-fixing scheme. Shelby Materials's Vice-President, Richard Haehl, immediately admitted his criminal conduct and offered to help the government investigate the cartel; the government, in turn, granted Haehl amnesty conditioned on his continued cooperation and, if required, truthful testimony at trial. Shortly thereafter, the government obtained indictments against Builder's Concrete, Irving Materials, and Hughey, Inc., and their respective corporate officers, Gus "Butch" Nuckols, Price Irving, and Scott Hughey. Nuckols, Irving, and Hughey eventually admitted their roles in the conspiracy and entered into plea agreements, in which they, too, offered to help the government investigate the cartel and testify truthfully at trial if called.

Upon enlisting the cooperation of Haehl, Nuckols, Irving, and Hughey, the government sought an indictment

against Beaver Materials and its corporate officers. The government's efforts paid off in April 2006, when a federal grand jury returned a four-count indictment against Beaver Materials, Ricky Beaver—the company's Commercial Sales Manager—and Christopher Beaver—the Operations Manager. Two of the counts were directed at Christopher. First, the indictment charged Christopher with participating in a price-fixing conspiracy in violation of § 1 of the Sherman Antitrust Act. Specifically, the indictment alleged that he met with competitors at "a horse barn owned by Gus B. Nuckols, III a/k/a Butch Nuckols, president of Builder's Concrete and Supply Co.," at which they agreed to increase prices, limit discounts, and implement surcharges; carried out and enforced their agreement; and attempted to conceal the conspiracy. *See* 15 U.S.C. § 1. The indictment also charged Christopher with making false statements regarding his participation in the conspiracy to an FBI agent who investigated it. *See* 18 U.S.C. § 1001(a)(1). Unlike their alleged cohorts, Christopher, Ricky, and Beaver Materials eschewed plea agreements and instead exercised their rights to a jury trial, at which the three were tried jointly.[1] The evidence introduced at trial, which we review in a light most favorable to the government, *see United States v. Andreas*, 216 F.3d 645, 670 (7th Cir. 2000), was as follows:

---

[1] Beaver Materials was charged with one count of participating in the price-fixing conspiracy. Like Christopher Beaver, Ricky Beaver was charged with participating in the conspiracy and making false statements to the FBI. Also named in the indictment was John Blatzheim, Executive Vice-President of Builder's Concrete. Blatzheim was likewise charged with participating in the conspiracy and making false statements to the FBI, but rather than go to trial he pled guilty to the charges.

The government presented the testimony of Haehl, Nuckols, Irving, and Hughey, who each provided details as to the origins of the price-fixing conspiracy and Christopher Beaver's role within the scheme. The men explained that, at the turn of the century, the ready-made-concrete market in the Indianapolis area was extremely competitive. The market was primarily occupied by eight concrete producers that often vied for the same customers by bidding on their construction projects. The companies' bidding and pricing processes were largely uniform. At the beginning of construction season in the spring of each year, the producers would send price lists to potential clients to inform them of the lowest possible rates at which they could provide concrete. The price lists usually featured five dollar amounts that went into the calculation of the quoted price. First, there was the base price—or, as it was called, the *gross price*—of the desired amount of a particular mix of concrete. Next, the price list provided the available *discount off the gross price for promptly submitting payment*; the price list then deducted this discount, which yielded the *net price*. But the producers' net prices were identical more often than not, so to distinguish themselves and undercut their competition the producers would include a fourth dollar amount on the price list: an *additional discount from the net price*. The producers would then calculate and quote to potential clients the *resulting discounted net price* as the lowest price at which they could provide the concrete. But as the competition for customers grew over the years, the producers offered increasingly larger net-price discounts that, in turn, depressed the market value of concrete, and, consequently, reduced the producers' overall profits.

The four men each continued that, in July 2000, Nuckols decided that it was time to address the falling market value of concrete. He accordingly organized a meeting

at his horse barn in Fishers, Indiana, of corporate officers of area concrete producers so they could discuss methods of "getting the price up." The meeting was attended by, among others, Haehl, Irving, Hughey, and Beaver Materials's representative, Ricky Beaver. All those present discussed ways in which they could "stabilize the market," leading someone (it is not exactly clear who) to propose a $5.50 limit on each producers' gross-price discount for a cubic yard of concrete; the gross-price-discount limit, in turn, translated to a net-price-discount limit of $3.50 per cubic yard. Although no vote was taken on the proposal, no one in attendance objected to it, nor did anyone refuse to impose the limit; as Haehl described it, "Nobody objected, nobody disagreed, nobody walked away." Indeed, each witness testified that he left the meeting with the firm understanding that an agreement to limit net-price discounts had been reached.

However, each of the four co-conspirators stated, the members of the concrete cartel did not always abide by their agreement. This periodic cheating contributed to the continuing downward spiral of concrete market prices, despite the cartel's efforts. As a result, individual members of the cadre separately met with each other at various times and locations to shore up the plan. But when those meetings failed to raise the price of concrete, Nuckols and Hughey called a second meeting of the entire cartel in May 2002, this time at the Signature Inn in Fishers. Every company participating in the cartel was represented, and, again, Nuckols, Haehl, Irving, Hughey, and Ricky Beaver attended. The purpose of the meeting was, as Haehl described it, "to just reaffirm" the agreement to limit their net-price discounts at $3.50. Just like at the earlier meeting at Nuckols's horse barn, no one objected to imposing the limit. Moreover, those in attendance all agreed to a method of enforcing the limit: if they became aware that another cartel member was offering a

net-price discount greater than $3.50, they would confront that producer about his cheating. And based, in part, on this plan, the meeting at the Signature Inn ended with Haehl, Nuckols, Irving, and Hughey each believing the attendees had reaffirmed the discount limit.

The four witnesses each continued to testify that in the days after the meeting at the Signature Inn, they attempted to enforce the net-price-discount limit by contacting those producers whom they believed were cheating on the cartel agreement. In fact, each man stated that, at one time or another they either confronted someone whom they believed was cheating, or were themselves accused of cheating. Nevertheless, their efforts to police the scheme proved incapable of reversing the downward spiral of concrete prices; as Nuckols testified, in the days following the meeting "our prices just were not doing well and they were going in the gutter." So Nuckols arranged another meeting at his horse barn in October 2003 to discuss the discount limits further. Haehl, Irving, and Hughey again attended, but this time Ricky Beaver did not; as it turned out, Ricky had not accurately conveyed the details of the agreement to the appropriate individuals at Beaver Materials. As Price and Hughey elaborated, Beaver Materials underbid Hughey, Inc., on two separate occasions after the July 2000 meeting, causing Hughey to telephone Christopher Beaver directly and ask him if Beaver Materials was cheating. Christopher, according to Hughey, denied that was the case, and stated that "he was at the discount that was established in the agreement with everyone." But, apparently, Ricky was confused about that discount, leading him to provide Christopher with the wrong information, and, in turn, causing Beaver Materials to quote prices in dereliction of the agreement. Therefore, to avoid the potential for any further confusion, Christopher took over representing Beaver Materials.

The four co-conspirators each further testified that the October 2003 began with Hughey bemoaning the fact that no one was abiding by the agreement, and urging those who did not want to follow the agreement to leave the meeting. Hughey recounted his exhortation: "'You know, guys, this thing is not being adhered to. And we need to decide are we going to agree on this and do what we say we're going to or just walk on out of here.'" But no one walked out. Instead, Hughey's lecture spurred a discussion among all the attendees—including Christopher Beaver—during which they again reassured one another that they each would limit their discounts to $3.50 off of the net price. The discussion did not end there, however. The group also agreed to increase the net price of each cubic yard of performance-mix concrete by $2, and by $2.50 for each cubic yard of bag-mix concrete. They further agreed to add a collective $2-per-cubic-yard surcharge for all concrete produced in the winter. Moreover, those present reasserted their commitment to police the agreement by confronting apparent cheaters.

Just like at the two earlier meetings, Haehl, Nuckols, Irving, and Hughey each stated that they understood that the attendees at the October 2003 meeting agreed to limit their net-price discounts to $3.50, in addition to adopting additional pricing restraints. No one present at the meeting—Christopher Beaver included—objected to the net-price-discount limit. Even more, Hughey testified, Christopher volunteered to contact the manager at American Concrete, another Indianapolis ready-made-concrete producer that was not represented at the meeting, "'and get him the message on what we agreed on.'"

After each of the four co-conspirators testified, the government presented the testimony of several FBI agents who recounted the agency's investigation into the concrete cartel. As relevant here, Special Agent Neil Free-

man testified that when the FBI conducted its searches and interviews on May 25, 2004, he questioned Christopher Beaver regarding the existence of the conspiracy; different FBI agents simultaneously interviewed Ricky Beaver and Allyn Beaver, Christopher's father and company President. During their conversation, Christopher stated that he had been employed by Beaver Materials for 21 years, and that in the "last couple years" he had become more involved in the pricing of the company's products because he would soon be replacing his father as President. When Freeman asked Christopher if he had attended any meetings at Nuckols's horse barn, Christopher answered, "No." Christopher also stated that he did not know of any other employee of Beaver Materials having attended such a meeting. He further told Freeman that he saw Beaver Materials's competitors only when attending meetings of the industry trade group, the Indiana Ready-Mix Association. In all, Freeman stated, Christopher "denied being involved with any kind of discussion of price fixing," and further disavowed ever meeting with any of the competing producers to discuss pricing and discount agreements.

The government rested its case after it presented the evidence regarding the origins of the price-fixing conspiracy, Christopher Beaver's participation, and his statements to Special Agent Freeman. Christopher then moved for a judgment of acquittal on the basis that the government had failed to introduce "any kind of evidence that would indicate that [Christopher] joined the conspiracy." *See* Fed. R. Crim. P. 29(a). After the district court denied the motion, Christopher presented the testimony of his sole witness—Chuck Mosely, who worked at Beaver Materials from 1991 until 2006 as a concrete salesman. Mosely testified that, during his time as a salesman, Christopher never told him how to price concrete. However, Mosely also stated that he knew that

Christopher attended "a price fixing meeting at Butch Nuckols's horse barn."

Beaver Materials, on the other hand, presented the testimony of Allyn Beaver and Charles Sheeks, Beaver Materials's corporate counsel. Allyn testified that Christopher Beaver had some influence over the company's prices, including the authority to authorize certain discounts. Allyn also stated that he was unaware of any price-fixing agreement between Beaver Materials and its competitors, though he did know that Ricky Beaver had been communicating with some of the other area concrete producers. Moreover, Allyn testified that he knew that Christopher had attended the October 2003 meeting at Nuckols's horse barn, that Christopher told him that those in attendance talked about prices, and that "the way that the meeting was going," it seemed like that the attendees "must be doing this all the time." However, Allyn did not know whether Christopher entered into any agreement with Beaver Materials's competitors.

Sheeks then testified that the day after the FBI conducted its interviews, he met with Christopher Beaver, Ricky Beaver, and Allyn Beaver at Beaver Materials's corporate office. There, Christopher and Ricky told Sheeks that they lied to the FBI about their presence at the meetings at Nuckols's horse barn. In response to this news, Sheeks sent a letter to the Department of Justice on May 28, in which he stated only that "[o]ne of the employees of my client made a misstatement to one of your agents to the effect he had not attended a meeting at what has been referred to as 'Butch's barn.' He did, in fact, attend the meeting."

After the defense rested the district court submitted the case to the jury, which found Christopher Beaver guilty on both the price-fixing-conspiracy and false-state-

ments counts.[2] Christopher then renewed his motion for a judgment of acquittal, *see* Fed. R. Crim. P. 29(c), challenging the evidence supporting his price-fixing-conspiracy conviction, but not his conviction for making false statements. After the court denied the motion, it sentenced Christopher to 27 months' imprisonment.

## II. ANALYSIS

Christopher Beaver raises two arguments on appeal. First, he argues that the district court erred by denying his motion for a judgment of acquittal because, he asserts, the government failed to prove at trial that a price-fixing conspiracy existed, or that he participated in the conspiracy. Christopher also challenges his false-statements conviction by asserting that the government failed to prove that the lies he told to Special Agent Freeman were material "as a matter of law." We address these arguments in turn.

### A. The Existence of, and Christopher Beaver's Participation in, the Price-Fixing Conspiracy

To prevail on his argument that the district court erred by denying his motion for a judgment of acquittal, Christopher Beaver must show that the court incorrectly concluded that there was sufficient evidence to sustain his conviction under the Sherman Antitrust Act. *See* Fed. R. Crim. P. 29(a); *Andreas*, 216 F.3d at 670. Although we review Christopher's argument *de novo*, *see United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002), he faces a "'nearly insurmountable'" burden on appeal, *United States*

---

[2] The jury also found Beaver Materials and Ricky Beaver guilty on all counts.

*v. Jackson*, 177 F.3d 628, 630 (7th Cir. 1999) (quoting *United States v. Moore*, 115 F.3d 1348, 1363 (7th Cir. 1997)). Viewing the evidence presented at trial in the light most favorable to the government, we will overturn Christopher's guilty verdict "'only if the record contains no evidence, regardless of how it is weighed,'" from which the jury could have concluded beyond a reasonable doubt that he is guilty. *See Andreas*, 216 F.3d at 670 (quoting *United States v. Agostino*, 132 F.3d 1183, 1192 (7th Cir. 1997)).

Christopher Beaver attempts to shoulder this burden by arguing that the government failed to prove that the concrete producers agreed to restrict their discounts on the net prices of concrete. Specifically, he contends that the evidence at trial showed that "no person voiced their assent to the supposed conspiracy." Thus, according to Christopher, the government failed to establish that the producers entered into an agreement in the first place.[3]

To prove a violation of § 1 of the Sherman Antitrust Act, the government had to introduce evidence showing that the concrete producers conspired to restrain trade, *see* 15 U.S.C. § 1; *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 & n.59 (1940); *Andreas*, 216 F.3d at 666; *United States v. Hayter Oil Co.*, 51 F.3d 1265, 1270

---

[3] Although Christopher argues that the government failed to show that the concrete producers agreed to limit their net-price discounts, he abandons any challenge to the illegality of the agreement itself. *See Crestview Vill. Apartments v. U.S. Dep't of Hous. & Urban Dev.*, 383 F.3d 552, 555 (7th Cir. 2004). This is wise; the net-price-discount limit constituted an illegal price-fixing arrangement, and thus was a *per se* illegal restraint of trade under § 1 of the Sherman Antitrust Act. *See Texaco Inc. v. Dagher,* 547 U.S. 1, 5-7 (2006); *United States v. Kahan & Lessin Co.*, 695 F.2d 1122, 1125 (9th Cir. 1982).

(6th Cir. 1995), by agreeing to fix the price of concrete through limiting their net-price discounts, *see Texaco Inc.*, 547 U.S. at 5-7; *Kahan & Lessin Co.*, 695 F.2d at 1125; *United States v. Am. Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 185-87 (3d Cir. 1970). Although the existence of such an agreement is "the essence" of the government's § 1 conspiracy allegation*, see United States v. Consol. Packaging Corp.*, 575 F.2d 117, 126 (7th Cir. 1978); *see also Nelson v. Pilkington*, 385 F.3d 350, 356-57 (3d Cir. 2004), the government did not need to show that the producers reached a "formal agreement" to limit their discounts, *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946); *see also United States v. Whaley*, 830 F.2d 1469, 1474 (7th Cir. 1987). Rather, the government was required only to establish that the concrete producers had "a tacit understanding based upon a long course of conduct" to limit their discounts. *United States v. Beachner Constr. Co.*, 729 F.2d 1278, 1283 (10th Cir. 1984); *see also Andreas*, 216 F.3d at 670; *cf. Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) ("[T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980))).

The government introduced ample evidence at trial that showed that the concrete producers shared a "tacit understanding" that they were to limit their net-price discounts collectively. In fact, the trial record is replete with details regarding the cartel's meetings in July 2000, May 2002, and October 2003, at which the producers discussed the net-price-discount limit, policing the limit, and other price restraints. Haehl, Nuckols, Irving, and Hughey each testified that, beginning in July 2000, the entire cartel met on at least three occasions with the

known purpose of addressing the falling price of concrete. During each of those meetings, the competitors discussed the ways in which they could "stabilize the market," leading to the proposed net-price-discount limit. And although no formal vote was taken on the discount limit, no one disagreed with the proposal or stated that he would not participate in the scheme. Indeed, when Hughey gave the producers the opportunity to oppose the price-fixing arrangement and leave the conspiracy, "Nobody objected, nobody disagreed, nobody walked away." Instead, the producers discussed additional methods of aligning their pricing practices, such as instituting general price increases and a winter surcharge. And based on these meetings and related discussions, Haehl, Nuckols, Irving, and Hughey each understood that an agreement was reached. *See Andreas*, 216 F.3d at 670; *Beachner Constr. Co.*, 729 F.2d at 1282.

Moreover, Haehl, Nuckols, Irving, and Hughey each testified that the concrete producers' communications were not limited to the July 2000, May 2002, or October 2003 meetings; they also enforced the discount restraint by confronting those who were cheating on the cartel. Each witness also testified that, on various occasions, they either confronted someone whom they believed was cheating or were themselves accused of cheating. Hughey likewise stated that on two separate occasions Christopher Beaver reassured him that Beaver Materials was abiding by the discount limit. In the face of this evidence, Christopher's assertion that "no person voiced their assent to the supposed conspiracy" rings hollow. Such assent was voiced when the co-conspirators either confronted others about cheating on the cartel, or reassured others—like Christopher did—that they were abiding by the agreement. *See Beachner Constr. Co.*, 729 F.2d at 1282; *cf. In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002) (stating that price-

fixing conspiracy can be proved by "actual, verbalized communication").

Christopher Beaver asserts, however that the concrete producers' occasional cheating on the discount limit shows that no agreement was ever reached. But this argument is illogical; certainly Christopher would agree that a breach of contract does not mean that the parties never entered into the contract in the first place. And the argument is also beside the point because § 1 of the Sherman Antitrust Act does not outlaw only perfect conspiracies to restrain trade. It is not uncommon for members of a price-fixing conspiracy to cheat on one another occasionally, and evidence of cheating certainly does not, by itself, prevent the government from proving a conspiracy. *See, e.g.*, *Andreas*, 216 F.3d at 679 (stating that cheating cartel members did not negate conspiracy); *United States v. Misle Bus & Equip. Co.*, 967 F.2d 1227, 1231 (8th Cir. 1992) ("Government witnesses testified that although [the defendant] occasionally 'cheated' his co-conspirators by bidding lower than was agreed, he . . . reached mutual understandings with the other participants about prices . . . and usually adhered to the prices and market allocations upon which they agreed."); *United States v. Foley*, 598 F.2d 1323, 1333 (4th Cir. 1979) ("Since the agreement itself, not its performance, is the crime of conspiracy, the partial non-performance of [the defendant company] does not preclude a finding that it joined the conspiracy." (citations omitted)). Thus, we cannot say that the producers' occasional cheating prevented the government from sufficiently proving that they conspired to fix the price of concrete.

Christopher Beaver continues his challenge to the sufficiency of the evidence underlying his price-fixing-conspiracy conviction by arguing that the government failed to show that he personally participated in the cartel.

In Christopher's view, the testimony of Haehl, Nuckols, Irving, and Hughey implicating him in the conspiracy was not credible because "no two competitors said anything as a whole which would corroborate the testimony of the others." But this argument fails from the start. "We will not second-guess the jury's credibility decisions in evaluating [Christopher's] challenge to the sufficiency of the evidence," *United States v. Johnson-Dix*, 54 F.3d 1295, 1306 (7th Cir. 1995); *United States v. Henderson*, 58 F.3d 1145, 1148 (7th Cir. 1995), even if his co-conspirators' claims were uncorroborated, *see United States v. Crowder*, 36 F.3d 691, 696 & n.1 (7th Cir. 1994).

But the credibility of Haehl, Nuckols, Irving, and Hughey aside, their testimony sufficiently implicated Christopher Beaver in the conspiracy. Specifically, each man testified that Christopher (1) was present at the October 2003 meeting at Nuckols's horse barn; (2) participated in discussions on how to limit the price of concrete; (3) did not object to the net-price-discount limit; (4) agreed to confront other conspiracy members if he found them cheating on the agreement; and (5) agreed on additional pricing constraints. Moreover, Hughey testified that, at the meeting, Christopher volunteered to contact the manager at American Concrete "and get him the message on what we agreed on."

Looking beyond the testimony of Haehl, Nuckols, Irving, and Hughey, the uncontradicted evidence regarding Christopher Beaver's responsibilities at Beaver Materials further bolsters the jury's conclusion that he participated the conspiracy. Christopher admitted to Special Agent Freeman that, as Operations Manager, he was involved in the pricing of the company's products, a role that would have allowed the jury to infer that Christopher was able to effectuate the net-price-discount limit. This inference is further supported by Hughey's testimony that he spoke with Christopher personally on two occa-

sions, and that during those conversations Christopher reaffirmed Beaver Materials's commitment to the discount limit. And the testimony of both Mosely and Allyn Beaver failed to contradict the evidence of Christopher's involvement. Both men stated that they knew that Christopher had met with competitors at Nuckols's horse barn in October 2003, and Allyn further stated that Christopher told him that pricing was discussed at that meeting. We thus cannot say that the government failed to prove that Christopher participated in the price-fixing conspiracy, or that the district court erred by denying his motion for a judgment of acquittal. *See Andreas*, 216 F.3d at 670.

### B.  Christopher Beaver's False Statements

Christopher Beaver next challenges his conviction under 18 U.S.C. § 1001(a)(1) for falsely stating to Special Agent Freeman that neither he, nor Beaver Materials, participated in the price-fixing conspiracy. Specifically, Christopher argues that the government did not prove that his statements were material "as a matter of law." As he explains, the government needed to show at trial that his statements to Freeman were material, *see* 18 U.S.C. § 1001(a)(1); *United States v. Moore*, 446 F.3d 671, 677 (7th Cir. 2006), meaning that the statements had the tendency to influence, or were capable of influencing, the FBI's investigation of the price-fixing conspiracy, *see United States v. Brantley*, 786 F.2d 1322, 1326 (7th Cir. 1986); *United States v. Di Fonzo*, 603 F.2d 1260, 1266 (7th Cir. 1979); *cf. United States v. Fernandez*, 282 F.3d 500, 508 (7th Cir. 2002) (explaining materiality in context of federal

mail-fraud statutes, 18 U.S.C. §§ 1341 and 1346).[4] According to Christopher, his false statements could not have influenced the FBI's investigation because his attorney, Sheeks, contacted the Department of Justice to correct the statements before they could lead the FBI astray.

Before we weigh the merits of Christopher Beaver's argument, however, we must take a moment to alleviate the confusion that apparently exists regarding his challenge. Specifically, Christopher mischaracterizes the issue of his false statements' materiality as "a matter of law." But the materiality of false statements is not a legal determination; it is, rather, a factual determination that is made by the jury only. As the U.S. Supreme Court explained in *United States v. Gaudin*, 515 U.S. 506, 522-23 (1995), the Sixth Amendment guarantees a criminal defendant's right to have a jury decide each and every element of the offense with which he is charged, including the element of materiality when the defendant is charged with making false statements. *See also United States v. Ringer*, 300 F.3d 788, 791-92 (7th Cir. 2002); *Waldemer v. United States*, 106 F.3d 729, 730-31 (7th Cir.

---

[4] In all, the government was required to prove at trial that (1) Christopher Beaver made a statement, or had a duty to disclose the information; (2) the statement was false, or that Christopher undertook acts amounting to concealment; (3) the statement or concealed facts were material; (4) Christopher made the statement or concealed the facts knowingly and willfully; and (5) the statement or concealed information concerned a matter within the jurisdiction of a federal department or agency. *See* 18 U.S.C. § 1001(a)(1); *Moore*, 446 F.3d at 677. Christopher, however, asserts only that the government failed to establish the materiality of his false statements. Thus, he has abandoned any further challenge to the sufficiency of the evidence underlying his false-statements conviction. *See Crestview Vill. Apartments*, 383 F.3d at 555.

1996); *United States v. Ross*, 77 F.3d 1525, 1538-39 (7th Cir. 1996). Indeed, the jury in Christopher's trial was instructed specifically to determine whether the government proved beyond a reasonable doubt that the false statements he made to Special Agent Freeman were material, and, by virtue of its guilty verdict, concluded that they were. Accordingly, Christopher's argument that the government failed to prove that his false statements were material requires us to examine whether the government introduced sufficient evidence to support the jury's conclusion. *See Moore*, 446 F.3d at 676-80; *United States v. Kosth*, 257 F.3d 712, 718-20 (7th Cir. 2001); *see also Ringer*, 300 F.3d at 791-92.

The government, in turn, contends that Christopher Beaver has "waived" any challenge to the sufficiency of the evidence supporting his false-statements conviction. As the government points out, Christopher did not challenge the evidence showing that he lied to Special Agent Freeman either when he moved for a judgment of acquittal at the close of the government's case, or when he renewed his motion after the jury's verdict; instead, he challenged only the evidence supporting his price-fixing-conspiracy conviction. Thus, the government asserts, Christopher intentionally relinquished the argument that insufficient evidence supported his false-statements conviction by failing to raise it specifically before the district court, and that such a "waiver" precludes our review of this argument.

The government is correct that Christopher Beaver "waived" his sufficiency-of-the-evidence argument regarding his false-statements conviction. *See United States v. Groves*, 470 F.3d 311, 324 (7th Cir. 2006); *United States v. Buchmeier*, 255 F.3d 415, 419 (7th Cir. 2001); *see also* 2A Charles Alan Wright, *Federal Practice & Procedure: Criminal* § 466 (3d. 2000). However, the government

incorrectly asserts that Christopher's failure to raise the point in his motion for a judgment of acquittal prevents us from addressing the argument on appeal; as we have stated many times, we review sufficiency-of-the-evidence arguments that were not presented in a motion for a judgment of acquittal under the plain-error standard. *See, e.g.*, *Groves*, 470 F.3d at 324; *United States v. Allen*, 390 F.3d 944, 947 (7th Cir. 2004); *United States v. Baker*, 40 F.3d 154, 160 (7th Cir. 1994). In this regard, the failure to challenge the sufficiency of the evidence is perhaps more precisely characterized as forfeiture rather than "waiver." *Cf. United States v. Brodie*, 507 F.3d 527, 530-31 (7th Cir. 2007) (differentiating between "waiver" and "forfeiture" in context of Fed. R. Crim. P. 12). *Compare Groves*, 470 F.3d at 324 (stating that sufficiency-of-evidence argument not presented in motion for judgment of acquittal is "waived," but nevertheless reviewed under plain error), *with United States v. Moore*, 425 F.3d 1061, 1069 n.5 (7th Cir. 2005) ("'Waiver precludes appellate review, but forfeiture permits review for plain error.'" (quoting *United States v. Jaimes-Jaimes*, 406 F.3d 845, 847 (7th Cir. 2005))). But regardless of what we call Christopher's failure to raise his challenge before the district court, we nevertheless proceed with a plain-error analysis, *see Groves*, 470 F.3d at 324; *Allen*, 390 F.3d at 947, meaning that Christopher can prevail only if he can show that, "absent reversal, a manifest miscarriage of justice will result," *Allen*, 390 F.3d at 947; *see also United States v. Rock*, 370 F.3d 712, 714 (7th Cir. 2004). Under this "most demanding standard, reversal is warranted only 'if the record is devoid of evidence pointing to guilt, or if the evidence on a key element was so tenuous that a conviction would be shocking.'" *Allen*, 390 F.3d at 948 (quoting *United States v. Taylor*, 226 F.3d 593, 597-98 (7th Cir. 2000)).

Moving (finally) to the merits of Christopher Beaver's argument, we reject his assertion that his false state-

ments were not capable of influencing the FBI's investigation because his attorney, Sheeks, contacted the Department of Justice to correct the statements before the FBI could actually be influenced by them. In fact, the argument fails for several reasons. First, the record does not even support Christopher's contention that he attempted to correct his false statements. The letter Sheeks sent to the Department of Justice did not say that Christopher made false statements to the FBI; the letter merely stated that "one of the employees" of Beaver Materials "misstated" that "he" was not at a meeting at Nuckols's horse barn. This "correction" could be understood as referring to Christopher, Ricky Beaver, Allyn Beaver, or any employee at Beaver Materials that spoke with FBI agents on May 25, 2004, but not as an admission by Christopher, himself, that he misled the FBI. Instead, the letter's vague language perpetuated Christopher's lies by implying that someone else had misled the FBI.

Moreover, Christopher Beaver is incorrect that he can avoid a conviction under § 1001 by correcting his false statements days after he spoke them. Contrary to Christopher's suggestions, § 1001 contains no recantation defense. *See United States v. Sebaggala*, 256 F.3d 59, 64 (1st Cir. 2001). Christopher nevertheless attempts to impute such a defense by citing one case in which a circuit court of appeals held that a criminal defendant can escape prosecution under § 1001 by correcting false statements "almost immediately"—*United States v. Cowden*, 677 F.2d 417, 420 (8th Cir. 1982). But Christopher did not attempt to cure his false statements "almost immediately"; Sheeks did not send the letter on Christopher's behalf to the Department of Justice until three days after Christopher lied to Special Agent Freeman. *Cf. United States v. Salas-Camacho*, 859 F.2d 788, 792 (9th Cir. 1988) (distinguishing *Cowden* and declining to find false statements immaterial when defendant corrected statements only

when confronted by federal agents); *United States v. Fern*, 696 F.2d 1269, 1275 (11th Cir. 1983) (distinguishing *Cowden* and declining to find false statements immaterial when defendant corrected statements only once Internal Revenue Service became suspicious). Christopher's reliance on *Cowden* is thus misplaced, and absent any further support he essentially asks us to interpolate a recantation defense into § 1001. But given Congress's silence on the issue, we decline his invitation to do so. *See Sebaggala*, 256 F.3d at 64 ("[W]e see no basis for writing into section 1001 a recantation defense that Congress chose to omit. After all, 'courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so.'" (quoting *Brogan v. United States*, 522 U.S. 398, 408 (1998))).

Because § 1001 contains no recantation defense, the materiality of Christopher Beaver's false statements must be assessed at the moment he uttered them. *See United States v. Lee*, 359 F.3d 412, 417 (6th Cir. 2004); *United States v. Sarihifard*, 155 F.3d 301, 307 (4th Cir. 1998) (stating that not measuring materiality of false statement at time of utterance would "allow witnesses who lie under oath to escape prosecution if their statements before a grand jury are obviously false"). And in so assessing the false statements, we conclude that they were material. Special Agent Freeman testified that Christopher denied meeting with any of Beaver Materials's competitors to develop discount limits or pricing constraints. According to Freeman, Christopher went so far as to say that the only time that he saw Beaver Materials's competitors was at Indiana Ready-Mix Association meetings. Because Christopher's statements concealed his actual role in the conspiracy, they could have hindered the FBI's investigation by directing its attention away from the October 2003 meeting at Nuckols's horse barn, away from Beaver Materials as a company involved in the cartel, and away from himself as an individual participant

in the conspiracy. Thus, we see no fault with the jury's determination that Christopher's false statements were material, much less can we say that we are shocked by his conviction. *See Moore*, 446 F.3d at 676-80; *Allen*, 390 F.3d at 948; *Kosth*, 257 F.3d at 718-20.[5]

## III. CONCLUSION

We AFFIRM Beaver's price-fixing-conspiracy conviction under 15 U.S.C. § 1, and his false-statements conviction under 18 U.S.C. § 1001(a)(1).

A true Copy:

    Teste:

 

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

---

[5] Beaver also asks us to grant him "amnesty" to reward the "affirmative steps" he took "to alleviate the harm" caused by his lies. But for the same reasons we will not impute a recantation defense into § 1001, *see Sebaggala*, 256 F.3d at 64, we will not create out of whole cloth an amnesty doctrine applicable to Beaver's wrongdoings, particularly when such a doctrine would essentially reward Beaver's instinct to lie to federal authorities about his role in the price-fixing conspiracy, *cf. Brogan*, 522 U.S. at 408 ("Courts may not create their own limitations on legislation, no matter how alluring the policy arguments for doing so, and no matter how widely the blame may be spread.").