# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-1265

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

SAMMY JONES, JR.,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01-CR-231—**Charles N. Clevert, Jr.**, *Judge.*

———————

ARGUED DECEMBER 17, 2003—DECIDED MARCH 5, 2004

———————


Before KANNE, ROVNER, WILLIAMS, *Circuit Judges.*

KANNE, *Circuit Judge.* Sammy Jones was working in Milwaukee's main post office when he was arrested and escorted across the street to an inspection services office for questioning. While in an elevator leaving the post office, Jones laid his head on the shoulder of one of the inspectors and said that he was sorry that he had let so many people down. Approximately 20 minutes later Jones was in a small interrogation room and that same inspector was question-ing him with a raised voice. A second inspector, visibly armed with a holstered handgun, also participated in the interrogation. Before halting the hour-long interview, Jones had confessed to opening envelopes and taking cash and a gift card. Jones moved to suppress his confession as invol-

untary, but he was unsuccessful. A jury ultimately found him guilty of one count of possession of stolen mail, 18 U.S.C. § 1708, and two counts of theft of mail by a postal employee, *id.* § 1709. He was sentenced to 5 months of time served (his bond had been revoked), $300 in special assessments, and $290 in restitution. On appeal Jones reasserts that his confession was involuntary and should have been suppressed. We agree with the district court that Jones's confession was not coerced and note also that even if it were coerced, any error in admitting it would have been harmless in light of the overwhelming evidence against Jones.

In February 2001 Katherine Scheller mailed her daughter-in-law three American Express gift checks totaling $250. Her daughter-in-law received the birthday card in a damaged-mail baggie, but the checks were missing. Scheller reported the incident to the post office and investigation later revealed that on February 5 Jones cashed those same three American Express gift checks, identifiable by their serial numbers, at his credit union. The gift checks formed the basis for the charge that Jones possessed stolen mail.

Postal inspectors conducted surveillance of Jones at his workplace. On May 14 Jones was assigned to work in the "rewrap" area where employees process damaged mail. Inspectors set up surveillance cameras to record Jones's activities, and they also observed him from behind shaded glass. The inspectors saw Jones leave his work station in the rewrap area several times and go to a different area where large greeting cards are sorted. Jones took envelopes back to his rewrap area, opened them, and removed their contents. The surveillance tape shows Jones opening up one card that was later identified to be sent by Katherine Trawitzki to her mother for Mother's Day, and removing a K-Mart gift card from the envelope. Jones had the K-Mart gift card when he was arrested. This incident formed the basis for one of the mail theft counts.

On the same morning, inspectors also caught Jones opening an "identifiable" piece of mail that they had put into circulation through his station. The inspectors made up a fake greeting card, complete with a fictitious recipient—Bobby Kendricks—and they put real cash inside. The inspectors photocopied the card and cash for later identification and then circulated it through Jones's work station. It is unclear whether the surveillance tape specifically caught Jones opening the Kendricks's card, but the card was later found set aside at Jones's work station, and he had the identifiable cash when he was arrested. This incident formed the basis for the second mail theft count.

According to testimony at the suppression hearing, four inspectors confronted Jones shortly after they observed him opening mail. The inspectors took him across the street, searched him, removed his handcuffs, and placed him in a small interview room. Inspectors James Gill and Jeff Girardot then conducted an interrogation that lasted approximately one hour. Girardot and Jones sat across from each other at a small table and Gill sat at one end. Gill was armed during the interview. The investigators began by asking Jones about the American Express gift checks, which he claimed to have legitimately purchased. The inspectors also asked Jones about the greeting cards, cash, and gift card. When he denied any wrongdoing, the inspectors challenged him, either by presenting him with evidence to the contrary, or, according to Jones, by yelling at him until he agreed with their version of events by saying "whatever you say is right."

Jones moved to suppress his confession, arguing that he had been coerced to confess by Girardot's yelling and Gill's display of his weapon. Jones further argued that, although he had attended interrogations in the past as a union representative, he had never seen an investigator conduct an interview while visibly armed; thus, his perception that his interview was abnormal only exacerbated his fears. At the

suppression hearing, though, Jones insisted that he "would not have taken a beating" from the inspectors. In response to the magistrate judge's invitation to submit additional memoranda after the hearing, Jones asked the court to consider his mental illness in assessing whether his statements were voluntary. (An earlier competency evaluation revealed that Jones suffered from paranoia, delusional behavior, and grandiose thoughts.) The magistrate judge, persuaded by Jones's familiarity with interrogations by postal inspectors and his comment that he would not have taken a beating from the inspectors, concluded that Jones's confession was voluntary. The district court adopted the findings and conclusions of the magistrate judge. At trial, Jones's statements were presented to the jury though Gill's testimony.

On appeal Jones reasserts that his confession was coerced. He attempts to focus our attention on his mental health. It is well established that mental state alone cannot render a confession involuntary; government coercion must also be a factor. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). In line with that rule, Jones's theory is that his delusional behavior, paranoia, and grandiose thoughts made him feel particularly threatened by Girardot's yelling and Gill's display of his weapon. But this was not the theme of his testimony at the suppression hearing. In fact, neither he nor counsel mentioned his mental state during the suppression hearing; his attorney raised the issue in a memo submitted after the suppression hearing, vaguely referring to evidence of Jones's mental health that had been presented to the court as part of a competency evaluation. Noticeably lacking, though, is any evidence that Jones was actually entertaining paranoid, delusional, or grandiose thoughts during the interrogation. Not once during his testimony at the suppression hearing did Jones suggest that he had irregular thought patterns during the interrogation. The district court considered the only evidence

before it regarding Jones's mental health and noted that he had already been found competent to stand trial and that the inspectors had done nothing to take advantage of his mental state.

Mental state is just one of many factors to consider when assessing the voluntariness of a confession. *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001). The nature of the interrogation, the length of the detention, whether the interrogators used physical violence, whether the interrogators informed the suspect of his rights, and the defendant's age, education, and intelligence level are also factors. *Id.* The nature of the interrogation, including the yelling and presence of a weapon, is Jones's primary complaint. But this factor is countered by many others. The interrogation lasted only an hour. *See, e.g., United States v. Doe*, 149 F.3d 634, 639 (7th Cir. 1998) (two hours of questioning handcuffed in the back of a police car in a remote location not sufficient to find waiver of rights involuntary). The inspectors informed Jones about his rights and did not use any physical violence. Jones was not handcuffed, and, although he never asked, he was not denied beverages, phone calls, or access to a restroom. In addition, he was in a familiar setting because he had attended similar interviews as a union representative.

There is evidence that Jones's will was *not* overborne. He professed his innocence with respect to one charge, and he was the one who ultimately ended the interrogation. Further, Jones admitted at the suppression hearing that he would not take a beating from the investigators, which the district court interpreted as proof of Jones's composure. So, the totality of the circumstances show that Jones's statements were voluntary.

Even if the confession were coerced, any error in admitting it would have been harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 303, 310 (1991) (holding that

harmless-error analysis applies to involuntary confessions). Regarding the possession-of-stolen mail count, documentary evidence showed that Jones signed and cashed three American Express gift checks that Scheller had mailed to her daughter-in-law. Scheller was able to verify that the checks were hers based on their serial numbers. The bank teller at Jones's credit union identified his signature on the checks and also testified that she remembered the transaction because she had asked Jones where he got the checks. As far as the two mail theft charges, one for theft of the Trawitzki mail and one for theft of the Kendricks mail, the documentary and testimonial evidence presented was overwhelming. Gill testified that he saw Jones leave his work station to retrieve greeting-card-sized envelopes from the sorting area and bring them back to his work station. Jones was also caught on surveillance tape opening up envelopes at his work station, removing their contents, and putting things into his pockets. Although neither of the charged envelopes was individually identifiable on the video, Jones was later caught with the contents of the envelopes in his possession—a K-Mart gift card from the Trawitzki envelope and $25 in identifiable bills from the Kendricks envelope. In sum, any error in admitting Jones's statements would have been harmless beyond a reasonable doubt. *Id.* at 310; *Chapman v. California*, 386 U.S. 18, 24 (1967).

Accordingly, we AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*