In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 07-3641, 08-1361, 08-3888 & 09-3484

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT VALLAR, TYRAIL CURRY,
AMADOR HERNANDEZ, and
ELADIO PEDROZA, SR.,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:05-CR-472—**John W. Darrah**, *Judge.*

ARGUED OCTOBER 26, 2010—DECIDED FEBRUARY 14, 2011

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge.* Three defendants were con-
victed of committing various drug-related offenses; a
fourth pled guilty. They raise a variety of arguments on
direct appeal, primarily challenging their sentences and
denials of motions to suppress their confessions. For the
following reasons, we affirm.

## I. Background

On September 20, 2005, a federal grand jury returned a fifty-one-count indictment against seventeen individuals, including Amador Hernandez ("Hernandez"), Eladio Pedroza, Sr. ("Pedroza"), Robert Vallar ("Vallar"), and Tyrail Curry ("Curry"). It charged the four with various offenses related to a drug conspiracy.

Juan Carlos Iniguez, a co-defendant who is not a party to this appeal, directed a drug business that distributed cocaine and heroin to multiple cities in the United States beginning in the summer of 2004. Iniguez obtained cocaine from an individual in Mexico, Juan Sanchez, and heroine from an individual named Jesus Ocampo. Iniguez distributed wholesale quantities of the drugs to co-conspirators Phillip King, Gonzalo Sanchez, and Vallar, among others, who were spread throughout Kentucky, Ohio, and Chicago. Pedroza assisted Iniguez in distributing cocaine and collecting proceeds.

Vallar was arrested at his home on May 26, 2005. He waived his *Miranda* rights and confessed to participating in the drug conspiracy. Hernandez was also arrested on May 26, 2005. After waiving his *Miranda* rights, he also confessed to various aspects of the charged crimes. Both Vallar and Hernandez moved to suppress their confessions. The district court denied both motions.

Curry pled guilty to the conspiracy charge on September 6, 2006. On April 13, 2007, a jury found Pedroza, Hernandez, and Vallar guilty on multiple counts. Hernandez and Pedroza separately filed motions for judgment of acquittal and a new trial in the alternative. The district court denied both motions.

On September 12, 2007, the district court sentenced Vallar to 151 months of imprisonment on Counts 1 and 35 and 48 months of imprisonment on Count 37, to run concurrently. On October 28, 2008, the district court sentenced Hernandez to 324 months on Counts 1, 23, 40, and 48, 60 months on Counts 9 and 49, 240 months on Counts 34 and 36, and 48 months on Counts 4, 25, 33, and 39, to run concurrently. On September 29, 2009, the district court sentenced Pedroza to 360 months of imprisonment on Count 1 and 48 months on Count 12, to run concurrently.

## II.  Analysis

### A.  Pedroza's Sentence

Pedroza challenges his sentence on four grounds. We review de novo whether the district court committed a procedural error, which includes determining whether the district court properly considered the factors in 18 U.S.C. § 3553(a) and mitigating evidence, and whether it improperly treated the guidelines as mandatory or otherwise unduly relied on them. *See Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Coopman*, 602 F.3d 814, 817-19 (7th Cir. 2010); *United States v. Omole*, 523 F.3d 691, 697-98 (7th Cir. 2008). Next, we review for abuse of discretion whether the sentence is substantively reasonable in light of the factors in § 3553(a). *Coopman*, 602 F.3d at 819.

First, while Pedroza concedes that the district court correctly calculated his guidelines range, he claims that

the district court misapplied the factors in § 3553(a)[1] and failed to adequately consider mitigating facts. This argument is vacuous.

The district court thoroughly analyzed the factors in § 3553(a) and committed no reversible error in doing so. It discussed the nature and circumstances of the offense—including the amount of drugs involved in the conspiracy, Pedroza's role in the conspiracy, and the harm from the drugs he distributed—Pedroza's history and characteristics—including his age and the fact that a guideline sentence would likely ensure that Pedroza would die in prison, that he has a strong family that he loves and supports, and his significant criminal history,

---

[1] The factors in § 3553(a) include, among other things:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed—

>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

>> (B) to afford adequate deterrence to criminal conduct;

>> (C) to protect the public from further crimes of the defendant; and

>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

> (3) the kinds of sentences available . . . .

18 U.S.C. § 3553(a).

including leading a drug distribution ring while imprisoned on a previous conviction—and the need for the sentence imposed to deter, promote respect for the law, provide just punishment, and protect the public from further crimes by Pedroza—including that Pedroza's previous sentences did not deter him from recidivating, his lack of remorse, and that he has no respect for the laws of the United States. The district court also considered that Pedroza would likely return and recidivate if he received a below-guidelines sentence and was deported after release, since he had been found in the U.S. illegally on three occasions.

The district court meaningfully considered the factors in § 3553(a). Pedroza claims that the district court did not adequately consider each of his mitigation arguments. The district court addressed the majority and strongest of Pedroza's arguments. That the district court did not explicitly discuss each of Pedroza's weaker arguments does not constitute reversible error under the facts of this case. *See United States v. Paige*, 611 F.3d 397, 398 (7th Cir. 2010) ("[W]e regularly affirm sentences where the district judge does not explicitly mention each mitigation argument raised by the defendant. Indeed, sentencing judges must only demonstrate meaningful consideration of § 3553(a) factors.").

Second, Pedroza claims that the district court did not adequately consider every factor in § 3553(a), specifically mentioning that the district inadequately discussed his history and characteristics, whether the sentence provided just punishment for the offense and would

promote respect for the law, and, more generally, whether the sentence was longer than necessary to promote the goals of sentencing. This argument is also meritless.

As the discussion above indicates, Pedroza's argument is belied by the record. The district court adequately discussed the factors in § 3553(a) he references. Thus, even if the district court did not consider each factor in § 3553(a), that would not constitute reversible error. *See, e.g.*, *United States v. Shannon*, 518 F.3d 494, 496 (7th Cir. 2008) ("The court need not address every § 3553(a) factor in checklist fashion, explicitly articulating its conclusions regarding each one. Instead the court may simply give an adequate statement of reasons, consistent with § 3553(a), for thinking the sentence it selects is appropriate.").

Third, Pedroza argues that the district court unduly relied on the guideline range in selecting his sentence. But we see no indication in the record that the district court treated the guidelines as mandatory or presumed that a within-guidelines sentence was reasonable. S*ee generally United States v. Carter*, 530 F.3d 565, 577-78 (7th Cir. 2008) (discussing whether the district court failed to properly recognize the advisory nature of the guidelines); *United States v. Schmitt*, 495 F.3d 860, 865 (7th Cir. 2007) (holding that a district court gave too much weight to the guidelines where "his remarks indicated that he felt that there was an outside constraint on his discretion that he was not free to set aside"); *United States v. Ross*, 501 F.3d 851, 853-54 (7th Cir. 2007). Instead, the record demonstrates that the district court adequately

explained its sentencing decision in light of the factors in § 3553(a) and Pedroza's characteristics.

Finally, Pedroza argues that his sentence is substantively unreasonable. He believes that a 360-month sentence is unnecessarily long in light of his age, fifty-seven, and points out that he will likely die in prison. He argues that a shorter sentence would sufficiently address the goals of sentencing. This argument is also unavailing.

We presume that Pedroza's sentence is reasonable because it falls within the properly calculated guidelines range. *United States v. Panaigua-Verdugo*, 537 F.3d 722, 727 (7th Cir. 2008). Pedroza "can rebut this presumption only by demonstrating that his or her sentence is unreasonable when measured against the factors set forth in § 3553(a)." *United States v. Nitch*, 477 F.3d 933, 937 (7th Cir. 2007) (internal quotation marks and citation omitted). This is no easy task when the defendant receives the lowest possible within-guidelines sentence, which Pedroza did. We have written that such a sentence "will almost never be unreasonable." *United States v. Tahzib*, 513 F.3d 692, 695 (7th Cir. 2008). Pedroza's strongest argument is that he is likely to die in prison if his sentence is not reduced. Still, we find no abuse of discretion under the circumstances of this case. *See Omole*, 523 F.3d at 698 ("This totality-of-the-circumstances analysis requires that we defer to the sentencing judge, who considers each defendant as an individual and decides sentences on a case-by-case, rather than wholesale, basis. We recognize that the sentencing judge

is in the best position to apply the § 3553(a) factors to the individual defendant, and that the judge sees things we cannot see, assesses in real-time the credibility of witnesses and defendants when we cannot, and develops insights from the various bits and pieces of information that he comes across in the course of a case that nonetheless are not reflected in the record."). Although "death in prison is not to be ordered lightly, and the probability that a convict will not live out his sentence should certainly give pause to a sentencing court," we have upheld such sentences on appeal where the sentencing court considered the likelihood of a defendant's death in prison, but concluded that other factors warranted the particular sentence. *United States v. Wurzinger*, 467 F.3d 649, 652-53 (7th Cir. 2006); *see United States v. Kincannon*, 567 F.3d 893, 901 (7th Cir. 2009). The record demonstrates that the district court seriously considered that Pedroza would likely die in prison if he received a within-guidelines sentence, but it nonetheless imposed the sentence based on the seriousness of Pedroza's crime, his past recidivism and the likelihood that he would continue to commit crimes if released from prison, the fact that he directed the operation of a drug distribution ring while in a federal prison, his lack of remorse for his offense, and its conclusion that Pedroza is a threat to society due to his persistent distribution of drugs. The district court did not abuse its discretion in sentencing Pedroza to 360 months.

### B. Hernandez's Sentencing Enhancement

Hernandez challenges the district court's application of a three-level enhancement pursuant to U.S.S.G. § 3B1.1(b) based on its conclusion that Hernandez played a supervisory or managerial role in the conspiracy. We review the district court's decision for clear error. *United States v. Curb*, 626 F.3d 921, 924 (7th Cir. 2010). We reverse "only if, after reviewing the entire evidence, [the court] is left with the definite and firm conviction that a mistake has been made." *Id.* (internal quotation marks and citations omitted).

Section 3B1.1(b) of the sentencing guidelines provides a three-level enhancement if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). The guidelines do not define the terms "manager" or "supervisor." But the fourth application note to § 3B1.1(b) provides a list of factors that we consider when determining whether a defendant had a managing or supervisory role:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1(b), cmt. n.4; *see United States v. Howell*, 527 F.3d 646, 649 (7th Cir. 2008) ("We have noted that these factors are to be used to distinguish leadership from management, but have found that they are still relevant in ascertaining whether an individual had a supervisory role at all."). "No one of these factors is considered a prerequisite to the enhancement, and, at the same time, the factors are not necessarily entitled to equal weight." *United States v. Anderson*, 580 F.3d 639, 649 (7th Cir. 2009) (internal quotation marks and citations omitted). When examining these factors, "we emphasize both relative responsibility and control over other participants." *Howell*, 527 F.3d at 649.[2]

The district court discussed six of the seven factors listed in application note four and based its finding that Hernandez worked as a manager or supervisor on a variety of factual determinations relevant to those factors, which included, among other things, that Hernandez (1) exercised decision-making authority; (2) took part in planning and organizing the offense by working as Iniguez's right-hand man and taking directions from Iniguez that required Hernandez to

---

[2] We note that there is some discussion in our case law regarding whether control over another participant is required for an enhancement or whether it is merely one factor that courts consider. *See United States v. Gonzalez-Mendoza*, 584 F.3d 726, 729 n.3 (7th Cir. 2009) (citing cases). Because we affirm the district court's conclusion that Hernandez had control over other participants in the conspiracy, we need not address the relative weight of control in this case.

exercise managerial and supervisory responsibilities over Raymond Salinas and Phillip King; (3) acted as a sounding board for Iniguez by discussing the organization and planning of the drug conspiracy with Iniguez on a somewhat regular basis; (4) exercised control and authority over others when he supervised Salinas and King; and (5) was entrusted with substantial sums of money. The district court concluded that there was "ample evidence" from trial and the sentencing hearing that Hernandez had a managerial or supervisory role in the drug conspiracy.

Hernandez claims that he played a passive role in the drug conspiracy, merely assisting Iniguez in carrying out the conspiracy without any authority or control over anyone involved. More specifically, he argues that he exercised no supervisory authority over Salinas or King and that the district court erred by concluding otherwise. He claims that it was Iniguez, not Hernandez, who attempted to supervise Salinas and King.

We find no clear error in the district court's conclusion that Hernandez was a manager or supervisor of the drug conspiracy, or in the district court's factual conclusions listed above that supported its decision to apply the enhancement. With regard to Hernandez's control over Salinas and King, the record demonstrates that Iniguez sent Hernandez to Kentucky on two separate occasions to oversee the receipt and distribution of drugs in Kentucky, despite the fact that both Salinas and King were there. It also permits the conclusion that Hernandez had authority over Salinas when at-

tempting to open hidden compartments in a car to retrieve drugs in Kentucky. *See United States v. Gonzales-Mendoza*, 584 F.3d 726, 729 (7th Cir. 2009) ("Villa admitted he was in Chicago to oversee drugs and drug proceeds for a Mexican cartel, which suggests he played a coordinating or organizing part in the criminal activity."). Hernandez claims that Iniguez exercised authority over Salinas and King, but this does not preclude the district court's finding that Hernandez also had such authority. *See* U.S.S.G. § 3B1.1, cmt. n.4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."); *see also United States v. Sainz-Preciado*, 566 F.3d 708, 715 (7th Cir. 2009) ("[A]ssuming that [the leader of the entire drug operation] did in fact tell Sainz-Preciado who to call to pick up the cocaine, Sainz-Preciado's resulting status as a mere middleman would not make him immune from application of § 3B1.1. It is Sainz-Preciado's relative responsibility and control over other participants that qualifies him as a manager . . . ." (internal quotation marks and citations omitted)). Further, Hernandez does not point us to portions of the record that negate the other above-mentioned factual conclusions that the district court reached, and the portions of the record to which the government directs us supports the district court's findings. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Accordingly, we find no clear error in the district court's application of a three-level enhancement for Hernandez's role in the drug conspiracy pursuant to U.S.S.G. § 3B1.1(b).

## C. Hernandez's Motion to Suppress his Post-Arrest Statement

Hernandez argues that he gave his post-arrest statement involuntarily and that the district court erred in rejecting his motion to suppress. We review de novo the district court's determination that Hernandez's confession was voluntary, *United States v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009), and we review the district court's relevant factual findings for clear error, giving "special deference to the district court's credibility determinations," *United States v. Villalpando*, 588 F.3d 1124, 1127 (7th Cir. 2009).

Due process requires that a criminal conviction not be based on an involuntary confession. *See generally Schneckloth v. Bustamonte*, 412 U.S. 218, 223-26 (1973); *United States v. Gillaum*, 372 F.3d 848, 856-57 (7th Cir. 2004). We have held that "[a] confession is voluntary if, in the totality of circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *Gillaum*, 372 F.3d at 856 (internal quotation marks and citations omitted); *see also Schneckloth*, 412 U.S. at 226. "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Gillaum*, 372 F.3d at 856 (internal quotation marks and citations omitted); *see also Montgomery*, 555 F.3d at 632. "[W]e analyze coercion from the perspective of a reasonable person in the posi-

tion of the suspect." *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001). We consider the following factors when evaluating coercion:

> The defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep. Narcotics, alcohol, and fatigue also may be considerations in a particular case.

*Id.*; *see also Schneckloth*, 412 U.S. at 226.

The facts of this case require affirming the district court's judgment. Agents came to Hernandez's home at 6:30 AM on May 26, 2005, and arrested him. Hernandez was in his late fifties at the time of his arrest. He has diabetes, low blood sugar, and a heart condition, which the interviewing agents knew at the time of the arrest. He attended school through the 8th grade, reads and speaks Spanish, and can speak English "80 percent." He also claims to have slow mental ability and a difficulty understanding what people tell him, although he has never been treated for mental disabilities. Agents asked Hernandez for his medications at the time of his arrest, which he provided, and then took him to their office for questioning. Agent Maria Lia Fowler ("Agent Fowler"), formerly known as Agent Lia Posada, asked if Hernandez had breakfast. Hernandez responded that he had not. He asked for a soda at 7:35 AM. Before the interrogation, Agent Fowler gave Hernandez a soda and his medications and permitted him to use the restroom. The district court found that after Agent Fowler played intercepted

calls for Hernandez, she read a Spanish-language version of *Miranda* warnings aloud and Hernandez signed an advice of rights form. Hernandez testified that he received his *Miranda* warnings at the end of the interrogation, that he received water but not a soda, and that he did not use the restroom. But the district court concluded otherwise, crediting the agents' testimony. Because Hernandez has not demonstrated that the agents' testimony was "exceedingly improbable," we defer to the district court's credibility determinations and accept its findings of fact. *United States v. Dillon*, 150 F.3d 754, 758 (7th Cir. 1998). The interview proceeded in Spanish and lasted two-and-a-half hours, from approximately 8:30 AM until 11 AM. Hernandez was handcuffed for the duration of the interview. Two agents testified that Hernandez did not complain of chest pains, shortness of breath, or other physical ailments before or during the interview. Hernandez disputes this, but, again, the district court credited the agents' testimony, and Hernandez fails to demonstrate that their testimony was "exceedingly improbable." *Id.* Hernandez also testified that he felt ill during the interrogation, but the district court credited other evidence that contradicted Hernandez's claim that he experienced chest pains and a heart attack during the interrogation. The agents gave Hernandez a snack after the interview, at 11 AM. Later that day, Hernandez was taken to a hospital to assess his suitability for confinement. The district court reviewed medical records indicating that while Hernandez was at the hospital, he said that his chest pains began three hours prior to his arrival at the hospital, which was at approximately 11:30 AM. Considering the totality

of the circumstances, we affirm the district court's decision to deny Hernandez's motion to suppress his confession; the facts simply do not suffice to conclude that the agents were coercive or that Hernandez's post-arrest statement was involuntary. *Compare Gillaum*, 372 F.3d at 857 (finding that the defendant's statements were voluntary when he was thirty-seven at the time of his arrest, he was personally familiar with the criminal justice system, he was read the *Miranda* warnings and indicated that he understood them, his interviewers, who knew he was diabetic, offered him food and insulin, which he refused, and he was interrogated for less than forty-five minutes, during which he was not handcuffed), *and United States v. Jones*, 359 F.3d 921, 923-34 (7th Cir. 2004) (holding that the defendant's confession was voluntary where the interviewing agents "informed Jones about his rights and did not use physical violence[,] Jones was not handcuffed, and, although he never asked, he was not denied beverages, phone calls, or access to a restroom," where "he was in a familiar setting because he had attended similar interviews as a union representative," and where Jones professed his innocence with respect to one charge and ultimately ended the interrogation, even though his interrogators yelled at him and displayed a weapon) *with United States v. Hull*, 441 F.2d 308, 312-13 (7th Cir. 1971) (holding that a defendant's confession was involuntary where he was mentally and emotionally handicapped and he endured "a continuous series of intensive interrogations for nearly twelve hours," during which he had no sleep or food except for a cup of coffee). We affirm the district court's denial of Hernandez's motion to suppress.

## D. Vallar's Motion to Suppress his Post-Arrest Statement

Vallar appeals the district court's denial of his motion to suppress his post-arrest statement. When reviewing a district court's denial of a motion to suppress, we review de novo whether the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights, and we review the district court's factual findings and credibility determinations for clear error. *United States v. Shabaz*, 579 F.3d 815, 819-20 (7th Cir. 2009).

Vallar asserts three arguments on appeal. First, he argues that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights. He points out that he was arrested at his home at 6:30 AM by officers with weapons drawn, that he was handcuffed for about an hour while agents searched his home, and that he was then taken to the police station and forced to listen to audio tapes implicating him in the alleged conspiracy before he received and waived his *Miranda* rights and provided the post-arrest statement he seeks to suppress.

Vallar's argument is unpersuasive. Defendants may waive their *Miranda* rights, but only if the waiver is "made voluntarily, knowingly, and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). Determining whether a waiver meets this standard requires a two-step inquiry:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must

have been made with a full awareness of both the
nature of the right being abandoned and the conse-
quences of the decision to abandon it. Only if the
totality of the circumstances surrounding the inter-
rogation reveal both an uncoerced choice and the
requisite level of comprehension may a court properly
conclude that the *Miranda* rights have been waived.

*Id.* (internal quotation marks and citations omitted). When
reviewing the totality of the circumstances, we consider
"the defendant's background and conduct, the duration
and conditions of the interview and detention, the
physical and mental condition of the defendant, the
attitude of the law enforcement officials, and whether
law enforcement officers used coercive techniques, either
psychological or physical." *Shabaz*, 579 F.3d at 820.

Vallar voluntarily, knowingly, and intelligently waived
his *Miranda* rights. Agent Michael Zobak, who participated
in Vallar's arrest, testified at the suppression hearing that
Vallar was handcuffed while officers searched his home;
that agents permitted Vallar to use the restroom at
his house while the officers were present; that nobody
threatened or shouted at Vallar; that Vallar was offered
a beverage and the use of a restroom upon arriving at
the station, both of which he declined; and that Vallar
was not handcuffed during the interrogation except
when agents moved him to different rooms. Agent Zobak
also testified that he read Vallar his *Miranda* rights
and that Vallar waived them and signed an advice of
rights form without any indication that he was confused.
The district court credited Agent Zobak's testimony.

Considering the facts Vallar points out above and Agent Zobak's testimony, we conclude that Vallar's waiver was voluntary. Further, the district court found that Vallar was capable of understanding his rights, and, thus, that his waiver was knowingly and intelligently made. Vallar does not challenge this finding on appeal, and we find no indication in the record that this finding was error. *See Colorado v. Spring*, 479 U.S. 564, 574-75 (1987) (affirming a district court's finding that the defendant knowingly and intelligently waived his *Miranda* rights where the defendant failed to allege that he did not understand his *Miranda* rights or the consequences of waiving them). Accordingly, we affirm the district court's decision that Vallar voluntarily, knowingly, and intelligently waived his *Miranda* rights.

Second, Vallar argues that the agents should have known that playing the recordings was "reasonably likely to elicit an incriminating response," and, thus, that it constituted an impermissible interrogation because Vallar had not received *Miranda* warnings before the tapes were played. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *see also Enoch v. Gramley*, 70 F.3d 1490, 1500 (7th Cir. 1995) ("We have stated that, under *Innis*, the issue is whether a reasonable objective observer would believe that the encounter was reasonably likely to elicit an incriminating response from the suspect and therefore constituted the functional equivalent of inter- rogation." (internal quotation marks and citations omit- ted)). *See generally Easley v. Frey*, 433 F.3d 969, 973-74 (7th Cir. 2006). Vallar's argument is unavailing. Merely apprising Vallar of the evidence against him by playing tapes implicating him in the conspiracy did not con-

stitute interrogation. *See Easley*, 433 F.3d at 973-74 (7th Cir. 2006) (holding that an officer's statement informing the defendant of the evidence against him and the possible consequences of the charges the defendant faced did not constitute interrogation, "even if its weight might move a suspect to speak"); *United States v. Sutton*, 77 Fed.Appx 892, 895 (7th Cir. 2003) ("[M]erely reciting the evidence supporting an arrest is not the functional equivalent of an interrogation."); *Enoch*, 70 F.3d at 1500 (holding that where "the police identif[ied] the victim to the suspect and briefly stat[ed] the evidence against him, followed by the suspect's allegedly incriminating statements" did not constitute interrogation because "[b]riefly reciting to a suspect in custody the basis for holding him, without more, cannot be the functional equivalent of interrogation"). But more critical to our analysis is the fact that Vallar made no statement in response to the tapes before he received and waived his *Miranda* rights. *See United States v. Peterson*, 414 F.3d 825, 827-28 (7th Cir. 2005) (writing that the problem with the defendant's argument that his confession violated *Miranda*, where agents laid out the evidence against him, administered *Miranda* warnings, obtained a waiver, and secured a confession, was that none of the defendant's statements preceded the warnings). Vallar's next argument is unpersuasive for the same reason.

Vallar's last argument is that the tactics agents used—specifically, playing taped conversations demonstrating that he participated in the alleged conspiracy before reading Vallar his *Miranda* rights and receiving a waiver—is improper under *Missouri v. Seibert*, 542 U.S.

600 (2004); *see also United States v. Stewart*, 388 F.3d 1079, 1086-90 (7th Cir. 2004). In *Seibert*, the Supreme Court reviewed a police protocol that called for interrogating a defendant and receiving a confession before giving *Miranda* warnings, then informing the defendant of his *Miranda* rights, receiving a waiver, and interrogating the defendant a second time, again obtaining a confession. 542 U.S. at 604. In a divided decision, the Court found the confession inadmissible. *Id.* at 617-618, 622. We have construed *Seibert* as holding "that post-warning statements are inadmissible if they duplicate pre-warning statements intentionally elicited in an effort to evade Miranda." *Peterson*, 414 F.3d at 828.

The agents' strategy of playing taped conversations and then reading Vallar his *Miranda* rights, receiving a waiver, and beginning to interrogate Vallar does not violate *Seibert*. The defendant in *Seibert* was interrogated and made incriminating statements both before and after waiving his *Miranda* rights. *Id.* at 604. Vallar was interrogated only after he received and waived his *Miranda* rights and he made no incriminating statements before signing his advice of rights form. *See Peterson*, 414 F.3d at 827-28 (holding that a defendant's confession did not violate the interrogation technique prohibited by *Seibert* where agents presented the evidence against him before reading him his *Miranda* rights and obtaining a waiver because the defendant did not make any pre-warning statement). We affirm the district court's denial of Vallar's motion to suppress.

**E. Vallar's Motions for Judgment of Acquittal and for a New Trial**

Vallar argues that the district court erred in denying his motion for acquittal and a new trial on the theory that there was insufficient evidence to find that he had a conspiratorial relationship with Iniguez, as opposed to merely a buyer-seller relationship. We review de novo a district court's denial of a motion for acquittal, *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir. 2003), and we review the district court's denial of a new trial for abuse of discretion, *United States v. Kosth*, 257 F.3d 712, 718 (7th Cir. 2001).

When evaluating a sufficiency of the evidence claim, "[w]e consider the evidence in the light most favorable to the prosecution, making all reasonable inferences in its favor, and affirm the conviction so long as any rational trier of fact could have found the defendant to have committed the essential elements of the crime." *United States v. Paneras*, 222 F.3d 406, 410 (7th Cir. 2000) (quoting *United States v. Masten*, 170 F.3d 790, 794 (7th Cir. 1999)). "Only if, from this vantage point, the record contains no evidence from which the jury could have found guilt beyond a reasonable doubt, is reversal appropriate." *Kosth*, 257 F.3d at 718. "Proving that no such evidence exists presents a nearly insurmountable hurdle to the defendant." *Fassnacht*, 332 F.3d at 447 (quoting *United States v. Hach*, 162 F.3d 937, 942 (7th Cir. 1998)).

"To convict a defendant of conspiracy, the government must prove that (1) two or more people agreed to commit an unlawful act, and (2) the defendant knowingly and

intentionally joined in the agreement." *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010). Attaining a conviction for conspiracy under 21 U.S.C. § 846, the relevant charge on appeal, requires proving "that the defendant knowingly agreed—either implicitly or explicitly—with someone else to distribute drugs." *Id.* But when the alleged coconspirators are in a buyer-seller relationship, "we have cautioned against conflating the underlying buy-sell agreement with the drug-distribution agreement that is alleged to form the basis of the charged conspiracy. To support a conspiracy conviction, there must be sufficient evidence of an agreement to commit a crime *other than* the crime that consists of the sale itself." *Id.* (internal quotation marks and citations omitted). Thus, "to prove a conspiracy, the government must offer evidence establishing an agreement to distribute drugs that is distinct from evidence of the agreement to complete the underlying drug deals." *Id.* at 755. Merely providing "evidence that a buyer and seller traded in large quantities of drugs, used standardized transactions, and had a prolonged relationship," without more, is inadequate to prove a conspiracy. *Id.* "Otherwise, the law would make any 'wholesale customer of a conspiracy . . . a co-conspirator per se.'" *Id.* (quoting *United States v. Colon*, 549 F.3d 565, 569 (7th Cir. 2008)).

The following are examples of evidence that would distinguish a conspiracy from a nonconspiratorial buyer-seller relationship:

> [S]ales on credit or consignment, an agreement to look for other customers, a payment of commission on sales, an indication that one party advised the other

on the conduct of the other's business, or an agree-
ment to warn of future threats to each other's busi-
ness stemming from competitors or law-enforcement
authorities.

*Id.* at 755-56. Importantly, "not all credit sales can
support an inference that there was an agreement to
distribute." *Id.* at 756 n.5. We have explained that a sup-
plier who extends credit to an individual who purchases
a small quantity of drugs for personal consumption
does not create a conspiracy. *Id.* But "when a credit sale
is coupled with certain characteristics inherent in an
ongoing wholesale buyer-seller relationship—i.e., large
quantities of drugs, repeat purchases or some other
enduring arrangement—the credit sale becomes sufficient
evidence to distinguish a conspiracy from a noncon-
spiratorial buyer-seller relationship." *Id.* (internal
quotation marks and citations omitted). Once "the gov-
ernment has offered *some* distinguishing evidence, the
jury may rely on [the following] factors . . . to buttress
an inference that there was an agreement to distribute
drugs": "whether the transactions involved large
quantities of crack . . . whether the parties had a standard-
ized way of doing business over time . . . whether the
parties had a continuing relationship . . . whether the
seller had a financial stake in a resale to the buyer; and . . .
whether the parties had an understanding that the
drugs would be resold." *Id.* at 758.

Vallar argues that the government's evidence estab-
lished a buyer-seller relationship between Vallar and
Iniguez, but not a conspiracy. He claims that the district

court erred by characterizing two kilograms attributed to him as a large quantity. He also argues that he had no long-term agreement with Iniguez to deal drugs. Although Vallar knew Iniguez for at least ten years, he claims that wiretaps presented at trial demonstrated that they were involved in drug dealing together for a period of less than two months. Vallar concedes that there was evidence at trial that he purchased drugs from Iniguez on credit. But he attempts to minimize this by arguing that Iniguez trusted Vallar due to their friendship, and that the government failed to prove that the friendship was of a business nature. Vallar also concedes that the evidence may indicate that he and Iniguez had a standardized way of doing business.

We reject Vallar's argument. It is undisputed that he purchased drugs on credit from Iniguez. Our review of the record indicates that these purchases occurred on at least two and likely three occasions. This distinguishes the conspiracy from a buyer-seller relationship. *See id.* at 755-56, 758. There is also evidence indicating that Vallar would not pay Iniguez until Vallar resold the drugs. Despite Vallar's argument that his relationship with Iniguez renders the sales on credit less meaningful, it is well-settled that repeated sales on credit, coupled with the fact that Vallar and Iniguez had a standardized way of doing business and evidence that Vallar would not pay Iniguez until he resold the drugs, permits the inference that Vallar conspired with Iniguez. *See, e.g., id.* at 756 n.5; *United States v. Rock*, 370 F.3d 712, 715 (7th Cir. 2004). Viewing the evidence in the light most favorable to the verdict, we affirm the judgment of the district court.

### F. Vallar's Sentencing Enhancement for Obstruction of Justice

Vallar appeals the district court's application of a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1. Section 3C1.1 permits courts to increase a defendant's offense level if he "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice." U.S.S.G. § 3C1.1. Perjury is a well-settled example of conduct that warrants an obstruction enhancement. *United States v. Bermea-Boone*, 563 F.3d 621, 626-27 (7th Cir. 2009). A witness commits perjury "if, while under oath, he 'gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *Id.* at 627 (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). On appeal, "[w]e review the factual findings underlying the district court's application of the obstruction enhancement for clear error, and we review de novo whether those findings adequately support the enhancement." *United States v. Anderson*, 580 F.3d 639, 648 (7th Cir. 2009).

The district court found that Vallar committed perjury when he testified that he signed the *Miranda* waiver because the agents tricked him by presenting the waiver form as a property receipt. In light of testimony from agents present when Vallar signed the waiver indicating that he freely and voluntarily waived his *Miranda* rights, the district court concluded that Vallar's testimony was false and that he knew it was false.

Vallar raises two challenges. First, he cites *United States v. Dunnigan*, 507 U.S. 87 (1993), to argue that the district court erred by failing to make sufficient findings that Vallar committed perjury. 507 U.S. at 95 ("[I]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out. When doing so, it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding. The district court's determination that enhancement is required is sufficient, however, if . . . the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury."); *see also Untied States v. Woody*, 55 F.3d 1257, 1273 (7th Cir. 1995). Second, he claims that there is no evidence in the record that would permit the court to conclude that he *willfully* provided false testimony. He asserts that he subjectively may have felt tricked, and that testifying to that effect does not constitute willfulness.

We disagree. First, the district court adequately determined that Vallar committed perjury at the suppression hearing. It explicitly found that Vallar's testimony was false. It also expressly concluded that Vallar intended to provide false testimony, stating that Vallar's explanation of how "his name happened to appear on a *Miranda* waiver, frankly, is not credible and not credible to the point where I find that it manifested an intent by

Mr. Vallar to deceive the court." Further, the testimony undoubtedly concerned "a material matter" because it came during a suppression hearing at which Vallar argued that his *Miranda* waiver was not voluntary, claiming that it resulted from coercive tactics. *Bermea-Boone*, 563 F.3d at 627 (quoting *Dunnigan*, 507 U.S. at 94); *see United States v. Carrera*, 259 F.3d 818, 831-32 (7th Cir. 2001) (affirming an obstruction enhancement where the district court merely concluded that testimony was false, but did not indicate its findings for each element of perjury, because concluding that the testimony was "untruthful" encompassed materiality where there was "no doubt that the district court considered [the subject of the false testimony] to be material"). Had the district court believed Vallar's testimony, it may have suppressed his confession. *See* U.S.S.G. § 3C1.1 cmt. 6 ("'Material' evidence, fact, statement, or information, as used in this section, means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination."); *see also United States v. Bedolla-Zavala*, 611 F.3d 392, 396 (7th Cir. 2010). Second, it was not clear error to conclude that Vallar willfully testified falsely. The district court weighed Vallar's testimony against the government agents' and concluded that Vallar lacked credibility. We find no clear error in this conclusion. *See United States v. Ofcky*, 237 F.3d 904, 910 (7th Cir. 2001) (affirming the application of an obstruction enhancement "where the trial judge weighed the testimony of the defendant against that of others and determined that the defendant's testimony lacked credibility."); *see also United States v. Pedigo*, 12 F.3d 618, 628-29

(7th Cir. 1993). We affirm the district court's application of the obstruction enhancement.

### G. *Anders* **Brief in the Case of Tyrail Curry**

Curry pled guilty to Count One, the conspiracy charge, on September 6, 2006. He admitted to participating in Iniguez's drug enterprise by assisting in the receipt and distribution of cocaine in Kentucky. The district court sentenced Curry to 210 months of imprisonment, the lowest within-guidelines sentence, and five years of supervised release.

Curry's counsel, a Federal Public Defender in the Central District of Illinois, concludes that Curry's case is without merit and submits an *Anders* brief seeking permission to withdraw. *See Anders v. California*, 386 U.S. 739 (1967). Curry did not respond to counsel's facially adequate brief. *See* Cir. R. 51(b). We limit our review to the potential issues counsel discusses. *United States v. Schuh*, 289 F.3d 968, 973-74 (7th Cir. 2002).

Counsel first considers whether Curry has any non-frivolous arguments to challenge his conviction. Since Curry does not seek to challenge his guilty plea on appeal, counsel properly declines to address any plea-related issues in his *Anders* brief. *See United States v. Knox*, 287 F.3d 667, 670-71 (7th Cir. 2002).

Counsel does consider, however, whether Curry has any non-frivolous arguments challenging his sentence. He properly concludes that Curry has none. First, Curry's within-guideline, 210-month sentence did not constitute a violation of law where it did not exceed

the statutory maximum sentence of life, 21 U.S.C. § 841(b)(1)(A); *United States v. Franz*, 886 F.2d 973, 977 (7th Cir. 1989), and where nothing in the record indicates that the district court violated Curry's equal protection, due process, or other constitutional rights, *see, e.g.*, *United States v. Moore*, 543 F.3d 891, 895-96 (7th Cir. 2008) (discussing a "class of one" equal protection claim). *See* 18 U.S.C. 3742(a)(1) (permitting defendants to appeal a final sentence that "was imposed in violation of law"). Next, the district court committed no procedural errors when applying the sentencing guidelines to determine Curry's sentence: It properly calculated the guidelines range, treated the guidelines as discretionary, considered the factors in § 3553(a), selected a sentence based on appropriate facts, and adequately explained the sentence it imposed. *See Gall*, 522 U.S. at 51. Finally, Curry's within-guideline sentence is not substantively unreasonable. *See United States v. Rivera*, 463 F.3d 598, 602 (7th Cir. 2006) ("A sentence, such as this, that falls within a properly calculated Guidelines' range is entitled to a rebuttable presumption of reasonableness. . . . [I]t will be a rare Guidelines sentence that is unreasonable." (internal quotation marks and citations omitted)). We grant counsel's request.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment and GRANT Curry's counsel's request to withdraw and dismiss Curry's appeal.

---

2-14-11